SECOND DIVISION

No. 1-09-2976

| | | |
|---|---|---|
| THOMAS M. TULLY, Trustee of the Thomas M. Tully Trust, and F.P.A., LLC, an Illinois Limited Liability Company, Individually and Derivatively on Behalf of Old Town Development Associates, LLC, | ) ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| DANIEL E. McLEAN, PIPER'S ALLEY MANAGEMENT, INC., an Illinois Corporation, LINCOLN PARK DEVELOPMENT ASSOCIATES, LP, an Illinois Limited Partnership, MCL COMPANIES OF CHICAGO, INC., an Illinois Corporation, MCL MANAGEMENT CORPORATION, an Illinois Corporation, and OLD TOWN DEVELOPMENT ASSOCIATES, LLC, an Illinois Limited Liability Company and Nominal Defendant, | ) ) ) ) ) ) ) ) ) ) ) | No. 06 CH 5431 |
| Defendants-Appellants. | ) ) ) | Honorable Stuart E. Palmer, Judge Presiding. |

JUSTICE KARNEZIS delivered the judgment of the court, with opinion.
Presiding Justice Cunningham and Justice Harris concurred in the judgment and opinion.

**OPINION**

Plaintiffs Thomas M. Tully, as trustee of the Thomas M. Tully Trust, and F.P.A.,

LLC (FPA), individually and derivatively on behalf of Old Town Development

Associates, LLC (OTD), filed an action against defendants Daniel E. McLean, Piper's

Alley Management, Inc. (PAM), Lincoln Park Development Associates, LP (LPDA), MCL Companies of Chicago, Inc. (MCL), MCL Management Corp. (MCL Management) (collectively defendants) and nominally against OTD. They asserted defendants committed fraud and breach of their fiduciary duties to plaintiffs in their management of OTD. The court agreed and ordered defendants to pay compensatory and punitive damages. Defendants argue (1) the judgment against LPDA must be vacated because there was no evidence of wrongdoing by LPDA; (2) the judgment ordering MCL Construction Corp., a nonparty, to disgorge fees must be vacated for lack of jurisdiction; (3) OTD must be dissolved as a matter of law; (4) the punitive damage award must be vacated for failure to comport with Illinois common law and constitutional due process or, alternatively, reduced because it was excessive and improperly calculated; and (5) the compensatory damage award must be reduced because the court erred in ordering disgorgement of management and construction fees and in awarding 13% equitable interest damages. We affirm in part and reverse in part.

BACKGROUND

McLean, a real estate developer, founded OTD in 1996 to purchase and develop Piper's Alley, a retail and entertainment complex in Chicago's Old Town neighborhood. OTD's operations were governed by an operating agreement. Pursuant to the agreement, OTD was a manager-managed limited liability company and the manager had to be a member of OTD. The manager-member of OTD had exclusive

responsibility for conducting OTD's business and the other members were to take no part in the management, conduct or control of the company.

In 1997, OTD bought Piper's Alley and spent considerable amounts renovating it. At that time, OTD's members/owners were: MCL, McLean, LPDA and private investors. MCL, a company owned and managed by McLean, was the original manager-member of OTD. MCL was replaced as manager and 1% member of OTD in November 2004 by PAM, another company owned and managed by McLean. LPDA was a company established by McLean to hold trusts he established for his children. The children's trusts owned 99% of LPDA. McLean owned the other 1% and managed LPDA. MCL Management, also a McLean-owned and managed company, was the property manager for Piper's Alley, serving as such until December 2005.

In 1999, FPA invested in OTD and became a 50% owner/member of OTD. Members of FPA were the Thomas M. Tully Trust (Tully Trust) and five individual trusts, one for each of Tully's children. Tully is the trustee of the Tully Trust, which is the manager-member of FPA. Tully, therefore, manages FPA.

In Tully's role as manager of FPA, he received monthly financial statements regarding OTD's operations. In 2002, he noticed an intercompany transfer from OTD to one of McLean's many other business entities unrelated to OTD. His accountant discovered numerous transfers back and forth between OTD and unrelated McLean-controlled enterprises. When questioned, McLean told Tully it was his regular practice to move funds back and forth between his assorted businesses as needed for funding

and cash flow. He told Tully the transfers were recorded on the books and periodically returned or paid back but that no interest was paid on the intercompany transfers. McLean agreed to Tully's request that he cease this practice as to OTD. He agreed that Tully would be a signatory on any OTD money transfer in excess of $5,000. McLean repaid all outstanding transfers and stopped making intercompany transfers from OTD.

In 2005, Tully learned that McLean had resumed transferring money in and out of OTD within six months of his 2002 promise to stop doing so. Instead of noting the transfers on OTD's books as he had done previously, McLean now hid the transfers in fictional accounts. McLean told Tully in January 2006 that he had been making transfers between OTD and non-OTD related accounts as "cash was needed here or elsewhere." Tully demanded PAM step down as manager-member of OTD and that McLean and his entities have no further involvement in running OTD. McLean refused, asserting he would never be a participant in a venture in which he was not the manager.

On March 17, 2006, Tully, as trustee of his own trust, and FPA, individually and derivatively on behalf of OTD, filed a complaint alleging fraud and breach of fiduciary duty against McLean, LPDA, PAM, MCL, MCL Management and nominally against OTD. At the time of the complaint, FPA owned 50% of OTD, McLean owned 39%, LPDA owned 10% and PAM, the manager-member, owned 1%. MCL was the former manager-member of OTD and MCL Management was the former property manager of

4

the Piper's Alley complex. Plaintiffs sought to enjoin further misappropriation by defendants of OTD's assets, asserting that McLean, through his entities, had been using the assets of OTD "as a private piggy bank" and had been systematically looting the assets of OTD. They alleged McLean was the alter ego of PAM, MCL and MCL Management, all three being wholly owned and controlled by McLean, and that he was the *de facto* manager of OTD and Piper's Alley.

Plaintiffs requested a temporary restraining order and preliminary and permanent injunctions precluding defendants, and specifically McLean, whether directly or indirectly, from managing or acting on behalf of OTD in any way and from denying plaintiffs access to OTD's records. They also sought appointment of an independent receiver to manage OTD; an accounting of OTD's business; expulsion of PAM as member and manager of OTD pursuant to section 35-45(6) of the Illinois Limited Liability Company Act (805 ILCS 180/1 *et seq.* (West 2008)) (the Act); compensatory and punitive damages for defendants' fraud, embezzlement and breach of fiduciary duty in their management of OTD; forfeiture by defendants of any compensation paid to them during the period of the fraud/breach; and no sharing by any defendant in the damage award.

By agreed order, the court ordered that McLean, MCL, MCL Management, PAM and their affiliates could no longer exercise any control over OTD's bank and escrow accounts and FPA would act on behalf of OTD pending appointment of a receiver. Subsequently, by agreed order, the court appointed Tully as the sole manager of OTD

for the duration of the litigation or until further order of court.

Defendants moved to dissolve OTD and appoint a receiver to wind up OTD's business. They asserted dissolution was required under section 6.1 of the operating agreement and section 35-1 of the Act because PAM had been removed as manager of OTD and Tully and McLean's relationship had completely deteriorated to the point that they could no longer work together. Plaintiffs opposed the motion. Defendants then filed a counterclaim seeking assorted declarations by the trial court and dissolution of OTD on essentially the same bases as raised in their motion to dissolve. The parties agreed that defendants' counterclaim and plaintiffs' count requesting PAM be expelled as member and manager of OTD would be tried separately from plaintiffs' counts for fraud and breach of fiduciary duty.

Following a seven-day bench trial, the court found it unquestionable that defendants were liable to plaintiffs for common law fraud and breach of fiduciary duty. It found it undisputed that over the course of the six years defendants managed OTD, they diverted millions of dollars of OTD's funds to shore up the finances and pay overdrafts of unrelated McLean-controlled entities, with the outstanding amount reaching as high as $2 million at one point. The court held the amounts defendants transferred from OTD were not loans but misappropriations, done to the detriment of OTD and impermissible under either the Illinois Limited Liability Company Act or common law. It found all defendants were controlled by McLean and acted in concert with McLean with regard to the breaches of fiduciary duty and fraud, and thus liability

6

for forfeiture extended to all defendants.

Finding no real issue of liability, the court considered the amount of actual and punitive damages to be awarded. With regard to actual damages, it awarded plaintiffs as damages 13% interest on the misappropriated funds. It ordered all management fees of MCL Management and MCL Construction be forfeited; reimbursement of loan fees charged by McLean, default loan interest and late fees paid on the mortgages and interest and penalties paid on the late real estate taxes; and payment of 13% interest on the security deposit money removed from OTD. The court agreed with defendants that the compensatory damages and forfeitures payable to plaintiffs should be reduced by 50% because Tully owned only 50% of OTD.

With regard to punitive damages, the court found "a 3:1 ratio to actual damages appropriate in this matter as anything less would not sufficiently deter McLean." It agreed with defendants that the forfeited management fees should not be included in the actual damages sum to which the punitive damage multiplier applied but denied their request to reduce the punitive damages award by 50%, stating that to do so would discount defendants' punishment or risk of punishment. The court awarded plaintiffs $1,010,671.96 in compensatory damages (50% of the total compensatory amount) and $3,231,550.26 in punitive damages (3x (100% compensatory award minus forfeiture amounts)), for a total of $4,242,222.22.

After a hearing on both plaintiffs' claim that PAM should be expelled from OTD and defendants' counterclaim seeking dissolution of OTD, the court found in favor of

plaintiffs on both claims. It ordered that PAM be "judicially expelled and disassociated from OTD" and that dissolution of OTD was not warranted under either the operating agreement or the Act. The court denied defendants' posttrial motion and defendants filed their timely appeal from the court's orders.

ANALYSIS

Defendants admit McLean's practice of moving funds back and forth between different companies, enterprises and projects was legally improper and they are liable for actual losses they may have caused OTD. They assert, however, that the court's judgments were "seriously, unfairly and unjustifiably excessive" and inequitable and this case represents a case of judicial overkill. They do not ask this court to overturn the entirety of the trial court's judgments. Rather, they request that we:

1. reverse and vacate the judgment against LPDA and dismiss it from the case;

2. vacate the judgment against MCL Construction as void for lack of jurisdiction;

3. order or declare the dissolution of OTD pursuant to section 35-1 of Act and section 6.1 of the operating agreement;

4. reverse and vacate the punitive damages award or, alternatively, reduce it;

5. reverse and vacate the judgment ordering defendants to forfeit the management fees of MCL Management and MCL Construction and reduce the 13% equitable interest rate imposed by the court, reducing the compensatory and punitive damages accordingly.

We address the arguments *seriatim*.

## I. Judgment Against LPDA

Defendants ask that we vacate the judgment against LPDA and the claims against LPDA be dismissed because LPDA cannot be liable for management misconduct as a matter of law. They assert LPDA was merely an investment partnership for McLean's children, did not participate in the management of OTD, had no fiduciary responsibility to plaintiffs, did nothing wrong and was a victim rather than a tortfeasor. Plaintiffs respond that defendants forfeited their argument that LPDA, separate and apart from the other defendants, cannot be liable because they did not raise it before the trial court until they filed their posttrial motion.

A party forfeits an issue for appellate review unless he has raised the issue both at trial and in a posttrial motion. *Thornton v. Garcini*, 237 Ill. 2d 100, 106, 112 (2009). Accordingly, defendants' argument regarding LPDA is forfeit if, as plaintiffs assert, defendants did not raise it until they filed their posttrial motion. *Thornton*, 237 Ill. 2d at 112.

As plaintiffs point out, the record shows defendants did not raise the argument in their answer, counterclaim, motion for summary judgment or closing argument. In their reply brief, defendants do not address plaintiffs' forfeiture argument. They do not assert that they raised their argument regarding dismissal of LPDA prior to their filing the posttrial motion, let alone point us to the salient pages in the record showing they so raised it. While the forfeiture rule does not bind the court, we are not required to research and argue issues on defendants' behalf. *People v. O'Connor*, 313 Ill. App. 3d

9

134, 137 (2000). The question of whether the court erred in finding against LPDA is forfeit.

## II. Judgment Against MCL Construction

Defendants ask that we vacate the court's judgment ordering MCL Construction to disgorge fees it received from OTD. They assert MCL Construction was not a party to the suit, was neither named nor served, did not appear and thus was not subject to the court's jurisdiction. Plaintiffs respond that defendants (a) forfeited this argument because they did not raise it before the trial court until they filed their posttrial motion and (b) the judgment cannot be reversed or amended because no judgment was ever entered against MCL Construction and the disgorgement order, therefore, does not require the court's jurisdiction over MCL Construction.

Defendants address plaintiffs' forfeiture argument, albeit only in a short footnote and without citation to authority. They claim that a jurisdictional issue cannot be forfeit and the issue did not arise until after entry of the judgment so could not have been raised earlier. Defendants are correct that the jurisdiction of a trial court may be challenged at any time so the issue was not forfeited when defendants failed to raise it below. *Norwest Mortgage, Inc. v. Ozuna*, 302 Ill. App. 3d 674, 677-78 (1998). However, jurisdiction is not at issue because, as plaintiffs assert, the court did not enter a judgment against MCL Construction.

The court's order was that, "[a]s a result of Defendants' breach of fiduciary duties[,] *** all the management fees of MCL Management and MCL Construction listed

in Plaintiff[s'] Exhibit 39F & G must be forfeited."[1]  Defendants assert the court, by this order, ordered MCL Construction to disgorge the fees it received from OTD.  Plaintiffs respond that the court did not order MCL Construction to disgorge anything, that there was no judgment entered against MCL Construction.  Plaintiffs assert that the fees the court ordered forfeited were fees paid to MCL Management under a management agreement between OTD and MCL Management for the operation of Piper's Alley and not fees paid to MCL Construction.  Defendants do not reply in any meaningful way to plaintiffs' assertions.[2]

From the wording of the order, read in context with the rest of the court's discussion of the forfeiture, it appears the court is ordering defendants, not MCL Construction, to forfeit the management fees.  The court discussed its finding that "all defendants acted in concert with McLean" in breaching the fiduciary duties and "therefore liability for the forfeiture extends to all defendants."

Looking at the management agreement referred to by plaintiffs, we find in

---

[1] "As a matter of public policy, a willful and deliberate breach of a fiduciary duty requires complete forfeiture of all compensation during the period of the breach." *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1071 (2001).  It lies within the equitable discretion of the trial court to determine the appropriate remedy for breach of a fiduciary duty. *LID Associates*, 324 Ill. App. 3d at 1071.

[2] Their response is limited to stating:
"Indeed, the plaintiffs seem not to oppose a vacation or clarification of that confusing 'non-judgment' in [the] order.  On this, the parties agree.  Accordingly, this [appellate] court should either vacate that disgorgement order or clarify that it is not an enforceable order nor a judgment against MCL Construction."

section 4.2, in a section titled "Compensation for Management Services," a provision that any construction or major alteration to the complex would be overseen "by [MCL Management] or its affiliate acting as general contractor" for a fee of 2.5% of the total costs incurred. So, per this agreement, OTD was to pay MCL Management a 2.5 % management fee for its or its affiliate's services in overseeing construction projects.[3] There is nothing to show these fees were paid to any entity other than MCL Management. Defendants do not direct us to any evidence showing that any of the "management fees" the court ordered defendants to forfeit or the management fees paid to MCL Management under the management agreement were fees actually paid to or passed on to MCL Construction. Once again, defendants leave it to this court to make their case for them. We decline to do so. Therefore, although it is possible that the exhibit 39G fees included construction management fees paid to MCL Construction, we cannot, without more, assume that this is the case. Accordingly, the court did not enter a judgment against MCL Construction and defendants' argument regarding lack of jurisdiction is, therefore, moot.

### III. Dissolution of OTD

Defendants ask that we direct the trial court to order the immediate dissolution and winding up of OTD. They argue the court erred in denying their request for dissolution because the court's removal of PAM as manager-member triggers the

---

[3] This fee was to be paid in addition to the 2.5% general management fee it earned for operating Piper's Alley.

dissolution provisions in section 6.1 of the OTD operating agreement and section 35-1(4)(B) of the Act .

Section 6.1 of the operating agreement provides OTD "shall be dissolved only in the event *** [o]f the death, removal, liquidation, dissolution, withdrawal or bankruptcy of a Manager."  Defendants argue that the court's order directing that "PAM is hereby judicially expelled and disassociated from OTD" pursuant to section 35-45(6) was clearly a "removal" of member-manager PAM from OTD and, therefore, triggered the section 6.1 provision of the agreement that OTD "shall" be dissolved.  The court had declined to apply the section 6.1 dissolution provision.  It found PAM had not been removed as manager pursuant to section 15-1(b)(3) of the Act, which provides that a manager "must be *** removed *** by a vote, approval, or consent of a majority of the members" (805 ILCS 180/15-1(b)(3) (West 2008)) and, therefore, dissolution under section 6.1 of the operating agreement had not occurred.[4]

The question is whether the court's judicial expulsion of PAM as a member pursuant to section 35-45(6) equates, as defendants assert, to PAM's "removal" as the manager of OTD under the agreement, thus triggering the agreement's dissolution provision.  Defendants argue the court improperly limited the section 6.1 removal

---

[4] Section 15-1(b)(3) provides in relevant part: "[i]n a manager-managed company: *** a manager: (A) must be designated, appointed, elected, removed, or replaced by a vote, approval, or consent of a majority of the members; and (B) holds office until a successor has been elected and qualified, unless the manager sooner resigns or is removed."  805 ILCS 180/15-1(b)(3) (West 2008).

provision to nonjudicial removals (by approval, vote or consent of the majority of the members pursuant to section 15-1(b)(3) - which clearly did not happen here). They assert the term "removal" is not qualified in the operating agreement and, therefore, is not limited to nonjudicial removals and should include judicial removals such as here by court decree pursuant to section 35-45(6).

Section 35-45(6) provides:

"A *member is dissociated* from a limited liability company upon the occurrence of

* * *

(6) On application by the company or another member, the *member's expulsion by judicial determination* because the member:

(A) engaged in wrongful conduct that adversely and materially affected the company's business;

(B) willfully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members under Section 15-3; or

(C) engaged in conduct relating to the company's business that makes it not reasonably practicable to carry on the business with the member." (Emphasis added.) 805 ILCS 180/35-45(6) (West 2008).

Citing section 35-45(6), the court found PAM had

"(A) engaged in wrongful conduct that adversely and materially affected the

14

company's business;

(B) willfully and persistently committed a material breach of the operating agreement or of a duty owed to the company or other members under section 15-3, specifically,

(1) to account to the company and hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or *** derived from a use by the member of the company's property, including the appropriation of the company's opportunity;

(2) to act fairly when a member deals with the company in the conduct or winding up of the company's business as or on behalf of a party having an interest adverse to the company.  [Citations.]

(C) engaged in the conduct relating to the company's business that makes it not reasonably practicable to carry on the business with the member."

The court then held: "[t]herefore upon application of the plaintiff member of OTD, PAM shall be expelled by judicial determination and disassociated from OTD."  It ordered PAM "judicially expelled and disassociated from OTD" and "OTD shall purchase PAM's interest pursuant to the applicable provisions of the [Act]."

The operating agreement does not define or explain what "removal" of the manager entails or how "removal" can come about.  It does provide, in section 1.1(c), that "[t]he ownership interests, rights and obligations of the Members as members in

15

the Company shall be as provided in the Limited Liability Company Act of the State, as amended, except and to the extent otherwise provided herein." Pursuant to section 15-5(a) of the Act, "[t]o the extent the operating agreement does not otherwise provide, this Act governs the relations among the members, managers, and company." 805 ILCS 180/15-15(a) (West 2008). Accordingly, because the operating agreement is silent on what "removal"of a manager entails, we look to the provisions of the Act.

The only provision in the Act that directly addresses how removal of a manager occurs is section 15-1(b)(3). Under section 15-1(b)(3), "a manager *** *must* be *** removed, or replaced by a vote, approval, or consent of a majority of the members." (Emphasis added.) 805 ILCS 180/15-1(b)(3) (West 2008). That clearly did not happen here and there was, therefore, no "removal" of PAM as manager under section 15-1(b)(3). Arguably, therefore, as plaintiffs assert, there was no "removal" of PAM as manager under the operating agreement and the dissolution provision was not triggered.

Defendants argue, however, that termination of PAM's member status necessarily terminates its manager status. They assert the court's expulsion of PAM as a member pursuant to section 35-45(6) means PAM was removed as manager because, under the operating agreement, only a member can serve as manager.[5] They

---

[5] Section 2.6 of the operating agreement provides that "the manager must own at least a one percent interest" of the company "during the entire existence of the company."

suggest there are two bases for removal of managers under the Act: by members' vote under section 15-1(b)(3)(A) and by dissociation of member-managers under section 35-45(b). They argue the section 6.1 dissolution provision is triggered by either type of removal. We agree.

The expulsion of PAM as a member by judicial decree does equate to "removal" of PAM as manager under the operating agreement because PAM was both manager and member. It may not have been the court's intention to remove PAM as manager and was certainly not a removal under section 15-1(b)(3), but it was a removal nonetheless. How can there be any question that expulsion of the member who serves as the manager is not also the expulsion of the manager? They are the same entity. Plaintiffs asserted PAM should be expelled as a member OTD because its conduct relating to OTD made it not reasonably practicable to carry on OTD's business with PAM. Yet they argue they did not also intend PAM to be expelled as manager. They could not work with PAM as a member but could somehow continue to work with PAM as the manager? Their argument is disingenuous.

On a side note, it appears plaintiffs have changed their argument regarding removal of PAM as a member from what they originally requested in their complaint. In plaintiffs' count III, they initially requested expulsion of PAM "as a member of OTD," which is in line with their assertion that they never requested the expulsion of PAM as a manager. However, their prayer for relief in count III requests the court to determine, pursuant to section 35-45(6) of the Act, "that PAM be expelled as a *member and*

17

*manager* of OTD." (Emphasis added.) When plaintiffs wrote their complaint, they apparently considered expulsion of member PAM to include expulsion of manager PAM. They were right. The court's order ordering the expulsion of PAM as a member of OTD necessarily includes the expulsion of PAM as the manager of OTD. An expulsion of the member serving as the manager is a removal of the manager and OTD should be dissolved under the agreement.

Pursuant to section 35-1(1) of the Act, "[a] limited liability company is dissolved, and *** its business must be wound up, upon the occurrence of *** [a]n event specified in the operating agreement." 805 ILCS 180/35-1(1) (West 2008). Therefore, given that the agreement calls for dissolution of OTD upon removal of the manager and we find such removal occurred, section 35-1(1) reinforces that dissolution is required.

Because we find that section 6.1 provides the basis for dissolving OTD, we need not address defendants argument regarding dissolution under section 35-1(4)(B).

IV. Punitive Damages Award

Defendants assert the court erred in awarding plaintiffs $3.2 million in punitive damages. They ask that we (a) vacate the award because it is in violation of common law; (b) vacate the award because it is in violation of due process; or (c) in the alternative, reduce the award to a more appropriate amount.

A. Violation of Common Law

The purpose of punitive damages is to act as retribution against the defendant, deter the defendant from committing similar wrongs in the future and deter others from

similar conduct. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 68 (2009).

"Such damages will be awarded only where the defendant's conduct is willful or

outrageous due to evil motive or a reckless indifference to the rights of others."

*Gambino,* 398 Ill. App. 3d at 68. Not favored in the law, punitive damages are available

only in cases where the alleged wrongful act "is characterized by wantonness, malice,

oppression, willfulness, or other circumstances of aggravation." *Gambino,* 398 Ill. App.

3d at 68. The court must determine (1) whether punitive damages are available as a

matter of law for the cause of action; (2) whether the facts show willfulness or other

aggravating factors; (3) whether punitive damages should be awarded under the facts at

bar; and (4) the amount of the punitive damage award. *Gambino,* 398 Ill. App. 3d at 69.

### 1. Availability

On appeal from a bench trial, we first review *de novo* the court's determination

that punitive damages were available as a matter of law for plaintiffs' cause of action.

*Gambino,* 398 Ill. App. 3d at 69. Defendants acknowledge punitive damages are

available as a matter of law for a breach of fiduciary duty (*Levy v. Markal Sales Corp.*,

268 Ill. App. 3d  355, 379-80 (1994)), so there is no argument here.

### 2. Factual Determination

Defendants assert the court erred in finding defendants exhibited a willful and

wanton disregard for the rights of plaintiffs. They argue the evidence and testimony

directly contradict any "evil motive," malice, oppression or willful and wanton disregard

of plaintiffs' rights, citing McLean's testimony that he did not misappropriate funds for his

19

personal use, always intended to and did repay any loaned funds and plaintiffs continued to receive profits and dividends from OTD. Asserting there was no evidence in the record to contradict McLean's testimony, defendants argue the court had no basis for finding McLean, much less all defendants, exhibited willful and wanton disregard for the rights of plaintiffs warranting imposition of punitive damages.

We review the court's factual determination that defendants acted willfully and that aggravating factors exist under the manifest-weight standard of review. *Gambino,* 398 Ill. App. 3d at 69. A ruling is against the manifest weight of the evidence if it is arbitrary, unreasonable, arbitrary and not based on the evidence, or when the opposite conclusion is clearly evident from the record. *In re Estate of Michalak*, 404 Ill. App. 3d 75, 96 (2010). In applying this standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses. *In re Estate of Michalak*, 404 Ill. App. 3d at 96. For that reason, we may not substitute our judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. *In re Estate of Michalak*, 404 Ill. App. 3d at 96.

In determining whether to award punitive damages, the court held defendants' conduct to be "truly outrageous" and "exhibiting a willful and wanton disregard for the rights of plaintiffs." It stated the conduct involved repeated actions rather than one isolated incident, the evidence establishing "well over 100 misappropriations over a period of six years." It also stated the harm incurred resulted from malice, trickery or

deceit. It held defendants had done their best to hide their conduct from plaintiffs and, once discovered and having promised to cease the conduct, devised more elaborate devices by which to conceal it. The court "was shocked by the nonchalance with which both McLean and his accountant *** described their misconduct in their testimony" and how any device they could use to deceive Tully was deemed justified because Tully was considered a pest and an impediment to McLean's business interests.

The record, in particular the testimony of McLean and his accountant, amply supports the court's finding that defendants' conduct was "truly outrageous" and "exhibiting a willful and wanton disregard for the rights of plaintiffs." It is clear that McLean and his accountant ran all of McLean's companies as essentially a single enterprise, transferring funds among the entities as needed for cash flow. McLean's accountant testified OTD did not need funds from the other entities and was used as a cash cow to help support those other companies. In more than 170 transfers, defendants transferred funds from OTD to other entities and back. They periodically returned some of the funds they took but not always, resulting in OTD being short on funds and unable to pay its mortgage or taxes on several occasions. Defendants made the transfers with full knowledge of the impact on OTD and with a complete disregard for those consequences. It is uncontested that OTD was a successful investment and Tully continued to receive profits and dividends from OTD. But that does not mitigate the fact that funds were being transferred out of OTD without compensation, defendants created fictional accounts to hide those transfers and this conduct continued for years, even

21

after McLean promised he would not do it any more. The court could clearly find defendants conduct outrageous and a willful disregard of plaintiffs' rights.

### 3. Award of Damages

Defendants argue the punitive damage award was not warranted to serve the purpose of punishment and deterrence because (a) the disgorgement of fees already constituted an award which was penal in nature and (b) significant evidence demonstrates the court was prejudiced against defendants prior to and during trial and the award may have been based on those negative passions. We review the court's determination that punitive damages should be awarded under the abuse of discretion standard. *Gambino,* 398 Ill. App. 3d at 69. "An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court." *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997).

With regard to the first assertion, as will be discussed below in section V(A), the court properly ordered forfeiture of management fees defendants earned from OTD during the period of their breach. It specifically excluded those fees from its calculation of punitive damages and there is, therefore, no merit to defendants' argument.

With regard to the second assertion, defendants argue the court's prejudice is shown by its (i) ordering the disgorgement of all management and construction fees, including those paid to MCL Construction, which was not a party; (ii) granting relief against LPDA, against whom plaintiffs did not request relief; and (iii) awarding punitive damages based on one defendant's "nonchalance" during testimony.

22

As was discussed in section II above, the court ordered disgorgement of "management fees"; it did not order disgorgement of "construction fees" and it did not order MCL Construction to disgorge anything at all. This evidence in no way supports defendants' claim that the court was prejudiced against McLean/defendants.

On the theory that all defendants, LPDA included, were controlled by McLean and worked together to defraud plaintiffs, plaintiffs sought recovery from all defendants. The fact that the court ordered recovery against LPDA does not, therefore, show prejudice.

There is no question the court was struck by McLean's "nonchalance" during his testimony. The court commented on it. This court was struck too by McLean's matter-of-fact discussion of how he moved funds in and out of OTD as he needed cash, of how he considered he had the right to make the transfers - which he referred to as "on-demand loans" with no paperwork or terms or interest - because he was not charging OTD an asset management fee for his services in developing the property. The fact that the court was struck by how commonplace McLean considered his conduct does not support a finding that the court was biased against him or the other defendants. McLean's attitude toward his actions would be relevant to the court's determination of whether the violating conduct was a wilful and continuing disregard of plaintiffs' rights. It was, therefore, well within the scope of the court's consideration. There is nothing to show the court's decision to award punitive damages was the result of the court's bias against defendants and the court improperly decided to award punitive damages.

23

4. Computation of Award

Defendants argue the court's computation of the amount of punitive damages was in error. We review the court's computation of the punitive damages award to determine whether the amount was excessive or the result of passion, partiality, or corruption. *Gambino,* 398 Ill. App. 3d at 69. The amount of the award should be a reflection of the court's determination as to the degree of maliciousness evidenced by defendants' actions. *Gambino,* 398 Ill. App. 3d at 69. Defendants assert there is no evidence that any of defendants' actions were taken with the deliberate goal of harming plaintiffs. Instead, the intercompany loans were designed to accommodate cash-flow issues which inevitably arise within the development business and there was no intent to harm plaintiffs' interests in OTD. They assert their actions, which inadvertently caused solely economic harm and from which they did not directly profit, "fall 'on the low-end of the scale for punitive damages.' "

The fact that defendants may not have intended to harm plaintiffs does not take away from the fact that they were fully aware of and ignored the impact their "on-demand loans" would have on OTD, plaintiffs' investment. The record shows OTD received no benefit from the transfers. It was in solid financial condition with sufficient cash flow of its own and did not require any transfers of funds. That is until the "loans" taken by defendants from OTD reached such a level that OTD was unable to pay its mortgage and real estate taxes. OTD was harmed by the transfers in that it could not meet its financial obligation and was charged late fees and penalties as a result. It also

was unable to use its own funds or earn interest thereon during the period the interest-free loans were outstanding.

It is disingenuous for defendants to claim they did not directly profit from the transfers. Of course they directly profited from the transfers. All the enterprises that received the transfers, as well as their owner, McLean, and all his inter-related businesses, including the other defendants, profited from the constant source of easily obtainable, interest-free financing. They made the most of this access for many years, taking care to hide what they were doing so that their practice could continue. The court awarded a 3:1 ratio to actual damages because "a 1:1 ratio [would be] insufficient to deter future misconduct as strong medicine is required to cure defendants' disrespect for the law." We do not find this excessive given the extreme level of misbehavior and defendants' attitude toward that misbehavior.

In their reply brief, defendants address the court's emphasis on McLean's cavalier "nonchalance" and perceived arrogance, an attitude the court said was shown by McLean's characterizing the compensatory damages as "peanuts." As defendants point out, McLean never characterized $2 million as "peanuts." When plaintiffs' counsel asked McLean whether he thought "everything involved here is peanuts," that Tully was complaining about "peanuts," McLean responded "I absolutely do not" and "this is a very serious case and a very serious matter." However, having read the entirety of McLean's testimony, it is clear that he did indeed think Tully was making trouble over essentially nothing, even though he might not have termed the amounts at issue to be "peanuts."

The court heard the testimony and was best able to judge the demeanor and character of the witnesses. It may have been wrong that McLean considered that the $2 million to be peanuts, but it was not wrong that a 3:1 ratio was necessary to deter future misconduct given McLean's attitude. This determination was entirely reasonable.

## B. Violation of Due Process

Defendants argue the court's punitive damages award violates the due process clause of the fourteenth amendment, "which prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor" (*International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 466-67 (2006)). We review this constitutional question *de novo*. *Lowe Excavating Co.*, 225 Ill. 2d at 469.

"[T]hree guideposts should be considered in reviewing an award of punitive damages: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' " *Lowe Excavating Co.*, 225 Ill. 2d at 470 (quoting *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418 (2003)). Defendants raises arguments regarding all three guideposts.

## 1. Degree of Reprehensibility

Defendants argue there was no evidence of such reprehensibility that would warrant the imposition of punitive damages in this case and the court's determination to

26

the contrary should be reversed. The degree of reprehensibility of the defendant's conduct is "the most important indicium of the reasonableness of a punitive damages award." *Lowe Excavating Co.*, 225 Ill. 2d at 470. When determining reprehensibility, the court must consider:

> "(1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard for the health and safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Lowe Excavating Co.*, 225 Ill. 2d at 470.

" 'The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award and the absence of all of them renders any award suspect.' " *Lowe Excavating Co.*, 225 Ill. 2d at 470-71 (quoting *State Farm*, 538 U.S. at 419). " 'It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.' " *Lowe Excavating Co.*, 225 Ill. 2d at 471 (quoting *State Farm*, 538 U.S. at 419).

In determining punitive damages, the court cited the five *Lowe* factors. With regard to the fourth factor, it found defendants' conduct "involved repeated actions as opposed to an isolated incident" and the evidence established "well over 100 of these

misappropriations over a period of six years." With regard to the fifth factor, it found it "clearly established that the harm incurred was the result of intentional malice, trickery or deceit." It stated defendants did their best to hide their conduct from plaintiffs; once discovered, promised to cease, only to begin again; devised more elaborate ways in which to conceal their conduct; were nonchalant about the misconduct; and deemed any device they could use to deceive Tully justified.

Defendants argue the court erred in finding the harm was the result of intentional malice, trickery or deceit under the fifth factor and that it should have considered the first three factors, all of which dictate against punitive damages.

With regard to the first two factors, there is no question that the harm here was purely economic and defendants' conduct did not evince an indifference or reckless disregard for the safety of others. With regard to the third factor, defendants assert there is nothing to show that plaintiffs were financially vulnerable. They acknowledge that OTD was occasionally cash-poor but state it was a healthy, successful enterprise and Tully recovered more than 80% of his investment. Defendants argue, taken together, the first three factors provide no indication that the defendants' conduct was so reprehensible as to warrant the imposition of any punitive damages. Although there is some small question about the financial condition of OTD, defendants' argument is for the most part true. However, a finding of reprehensibility does not require that all five factors be met. *Lowe Excavating Co.*, 225 Ill. 2d at 483. Such a finding can rest, as here, on the existence of only two of the five factors. *Lowe Excavating Co.*, 225 Ill. 2d at

28

483 (court found reprehensibility existed because facts demonstrated defendant acted with intentional malice (fifth factor) and, to a lesser extent, had repeated its conduct (fourth factor)). As will be shown, the fourth and fifth factors lend solid weight to a finding of reprehensibility under the facts of this case.

With regard to the fourth factor, whether the conduct involved repeated actions or an isolated incident, defendants merely state that they "do not dispute" the court's finding that they made the intercompany loans on more than one occasion. The court did not just find defendants made the intercompany transfers "on more than one occasion." It found defendants made the misappropriations from OTD on over 100 occasions. There is clear evidence that defendants made the majority of these misappropriations with full knowledge that, at a minimum, Tully did not approve, that the transfers were probably illegal and that they should hide what they were doing. They engaged in a "pattern of misconduct" that typified the manner in which they ran their businesses. This is recidivist conduct. *Lowe Excavating Co.,* 225 Ill. 2d at 481. And recidivist conduct is to be considered reprehensible. *Lowe Excavating Co.*, 225 Ill. 2d at 477.

" 'Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law. [Citation.] Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more

29

reprehensible than an individual instance of malfeasance.' " *Lowe Excavating Co.*, 225 Ill. 2d at 477 (quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 576-77 (1996)).

The strength of the recidivist evidence under the fourth factor weighs strongly in our overall assessment of reprehensibility.

With regard to the fifth factor, whether the harm was the result of intentional malice, trickery, or deceit, or of mere accident, defendants argue the court erred in finding that their actions were the result of intentional malice, trickery or deceit. They assert there is no evidence in the record that any of defendants' actions were taken with the deliberate goal of harming plaintiffs. They assert the evidence shows defendants took the intercompany loans to accommodate the inevitable cash-flow issues arising in the development business, intended to repay those loans and did repay them, and did not take the loans with the intent of harming OTD or Tully's interests.

There is no question plaintiffs' harm resulted from defendants' trickery and deceit. The evidence shows defendants made the misappropriations knowing they were inappropriate and, in order to hide evidence of the misappropriations, disguised them as transfers to a nonexistent tax escrow account and as "transfer in transit." They knew the monthly financial statements they submitted to plaintiffs for OTD's operations were false, yet for six years continued their behavior. McLean promised to stop making the withdrawals but six months later, started taking them again, this time disguising them more carefully. Defendants clearly acted with intentional trickery and deceit toward

plaintiffs and the fifth factor is met.  Based on the strength of the evidence under the

fourth and fifth factors, we find defendants' conduct was reprehensible.

2. Disparity Between Actual Harm and the Punitive Damages Award

Defendants argue that, although the court stated its punitive damages award was three times the amount of compensatory damages, the award is actually eight times that amount. Defendants assert the court improperly assessed punitive damages for harm which resulted to defendants themselves by including in its calculation the amount defendants were ordered to forfeit as loan fees and by calculating punitive damages on 100% of the compensatory amount, 50% of which was actually compensatory damages to defendants. They assert the court should have adjusted the compensatory base by removing all damages which were already punitive in nature (the loan fees) and by further reducing the base by the 50% ownership in OTD held by defendants. They refer us to their "section IV.B" argument seeking reduction of the award, addressed in our section IV(C) below, for further explanation of how the court erred in its calculation of the award. As will be discussed in section IV(C), the court did not improperly calculate the punitive damages award and did not award an 8:1 ratio in punitive damages. The court awarded, as it said, a 3:1 ratio of punitive damages to compensatory damages.

In considering whether the 3:1 ratio is constitutional, we must "consider whether there is a reasonable relationship between the punitive damages award and the potential and actual damages resulting from the defendant's conduct." *Lowe Excavating Co.*, 225 Ill. 2d at 484. There is no "bright-line ratio which a punitive damages award cannot exceed," but rarely will an award greater than a single-digit ratio between punitive and compensatory damages satisfy due process, with an award

32

greater than four times the amount of compensatory damages being "close to the line." *Lowe Excavating Co.*, 225 Ill. 2d at 484.

Given the depth of defendants' deceit and the number of years they perpetrated it, the 3:1 ratio does not seem excessive. However, the best way to determine whether the 3:1 ratio is appropriate is to compare it to punitive damages awards in other, similar cases. *Lowe Excavating Co.*, 225 Ill. 2d at 487. To that end, defendants cite to *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129 (2004), and *Monotronics Corp. v. Baylor*, 107 Ill. App. 3d 14 (1982), cases in which the court found breach of fiduciary duty but declined to award punitive damages.

In *Franz*, the court did not analyze the trial court's decision not to award punitive damages despite the defendant's bad faith beyond stating that the trial court did not abuse its discretion. *Franz*, 352 Ill. App. 3d at 1149. *Franz* is, therefore, of no use to defendants at all in demonstrating the 3:1 ratio imposed here was excessive. In *Monotronics Corp.*, the court merely stated that the trial court did not abuse its discretion in failing to award punitive damages because the defendant's behavior was not found to be fraudulent or malicious. Since defendants' behavior here was fraudulent and malicious, *Monotronics Corp.* is not apposite.

Defendants also cite to *In re Estate of Talty*, 376 Ill. App. 3d 1082 (2007); *In re Estate of Hoellen*, 367 Ill. App. 3d 240 (2006); and *Caparos v. Morton*, 364 Ill. App. 3d 159 (2006), in support of their argument that the award is excessive. Again, none of

33

these cases are apposite to the situation at bar.[6]

In *Talty*, the court affirmed the trial court's punitive damages award of attorney fees, costs and witness fees for an executor's breach of fiduciary duty. Beyond stating that the award was clearly necessary to punish the defendant for disregarding the beneficiary's rights, the court did not discuss the award. There was no discussion about the relationship between the punitive and compensatory damages awards so the case is of no use here. In *Hoellen*, the court affirmed the court's $50,000 punitive damages awarded on a $1 compensatory damages award. Given that the punitive damage to compensatory damage ratio in *Hoellen* was 50,000:1, this case clearly does not support an argument that 3:1 (or 8:1) is excessive where reprehensibility is so evident.

Lastly, in *Caparos*, the court affirmed a $1 million punitive damages award on a compensatory damages award of $4.9 million where general partners in business misled limited partners. The court found the trial court's reason for imposing punitive damages (that defendants acted fraudulently, maliciously or in a manner warranting punitive damages) was not contrary to the manifest weight of the evidence. It also found the award was not excessive because the trial court did not abuse its discretion in finding a substantial punitive damages award was necessary due to the need for retribution

---

[6] Defendants presented these arguments in the context of the third guidepost, where they are irrelevant. However, we will consider them here in the context of the second guidepost.

against the wrongdoer, deterrence of similar conduct by that party and by others in general and the amount of money involved in the transactions. The court did not discuss the ratio of punitive to compensatory damages at all, let alone in the context of conduct as egregious as that at issue here, and *Casparos* is of no use to defendants' argument.

As plaintiffs point out, a better case analogy would be to *Lowe Excavating Co.*, 225 Ill. 2d 456, in which the court awarded punitive damages in an 11:1 ratio based on its finding that the fifth reprehensibility factor was strongly present and the fourth factor marginally so. Here, where both the fourth and fifth factors are strongly present, an award of 3:1 does not seem excessive.

### 3. Sanctions For Comparable Misconduct

The last guidepost to consider is the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases in order that substantial deference be accorded to legislative judgments concerning appropriate sanctions for the conduct at issue. *Lowe Excavating Co.*, 225 Ill. 2d at 489. Defendants make no argument that there are any civil penalties imposed by statute for breach of fiduciary duty and we are not aware of any. It being undisputed that there is no comparable Illinois law imposing a civil penalty for breach of fiduciary duty, we need not consider this guidepost any further. *Lowe Excavating Co.*, 225 Ill. 2d at 489.

### C. Reduction of Award

Defendants argue, in the alternative, that the punitive damages award should be

35

reduced because the trial court erred in computing it. Defendants argue the court erred in not excluding the $270,000 in "loan fees" it ordered defendants to disgorge from the compensatory base and in not reducing the compensatory base by 50%.

Defendants argue the court should have excluded from the compensatory base the $270,000 in loan fees it ordered defendants to forfeit. They assert the court properly excluded from the base the amount of management fees it ordered defendants to forfeit because that forfeiture was punitive in nature and it should similarly have excluded the loan fees. However, as discussed in section V(B) below, the "loan fees" were nothing more than another way of hiding inappropriate transfers. They were not fees earned by defendants during the period of the breach but misappropriations of funds that belonged to OTD. The court properly ordered those misappropriated funds be reimbursed to OTD. Forfeiture of the loan fees was not punitive and the court did not err in including the fees in its calculation of punitive damages.

Defendants next argue the court should have reduced the compensatory base by the amount of ownership in OTD held by defendants, *i.e.*, by 50%. They argue it is inequitable and unwarranted to award punitive damages based on a damages figure that includes damages to defendants' own interests. The court refused to reduce the compensatory base by defendants' 50% ownership interest because to do so would discount defendants' punishment or risk of punishment. A fiduciary should not benefit from its own wrongdoing. *Caparos*, 364 Ill. App. 3d at 180. Accordingly, the court did not err in awarding punitive damages on 100% of the compensatory damage award

36

(minus the forfeited management fees).

For the reasons stated above, the court abused its discretion neither in determining the compensatory base nor in awarding the 3:1 ratio of punitive damages to compensatory damages.

### V.  Compensatory Damage Award

Defendants ask that we reduce the compensatory damages award because it improperly encompassed (a) disgorgement of management fees paid by OTD to MCL Management and MCL Construction, because neither entity had a fiduciary duty to OTD and had been paid under services agreements expressly authorized by OTD's operating agreement; (b) disgorgement of brokerage fees paid to MCL because there was no evidence that MCL did not earn those fees; and (c) 13% interest on the intercompany loans from OTD because that rate is almost triple the prevailing prime interest rate and is simply punishment rather than fair compensation.  We will not set aside the assessment of damages by a trial court sitting without a jury unless it is manifestly erroneous.  *Vendo Co. v. Stoner*, 58 Ill. 2d 289, 311 (1974).

### A.  Management Fees of MCL Management and MCL Construction

Defendants argue the court erred in ordering MCL Management and MCL Construction to disgorge management fees they had earned because neither company had a fiduciary duty to OTD, they should not be punished as a result of McLean's breach of fiduciary duty and the fees were expressly authorized under OTD's operating agreement.  "[A] willful and deliberate breach of a fiduciary duty requires complete

37

forfeiture of all compensation during the period of the breach." *LID Associates*, 324 Ill. App. 3d at 1071. The reasoning is that a fiduciary is entitled to compensation only if it duly and faithfully performs *all* its duties during the period of breach. *Levy*, 268 Ill. App. 3d at 373-74. The purpose of ordering forfeiture of a fiduciary's compensation earned during the period of a breach is not to compensate the injured party but rather to deprive the wrongdoer of the gains from the breach of duty and to deter disloyalty. *Levy*, 268 Ill. App. 3d at 373. It lies within the equitable discretion of the trial court to determine the appropriate remedy for breach of a fiduciary duty. *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1071 (2001).

As a result of defendants' breach of their fiduciary duty to plaintiffs, the court ordered defendants to forfeit "all the management fees of MCL Management and MCL Construction listed in [plaintiffs' exhibits 39F and G]." The court did not, as defendants assert, order only MCL Management and MCL Construction to disgorge fees. First, as previously discussed in section II above, the court did not order MCL Construction to do anything at all, so we will not discuss defendants' argument with regard to MCL Construction. Second, it ordered *all* defendants to disgorge those fees, not just MCL Management. The court found it unquestionable that all defendants were liable to plaintiffs for breach of fiduciary duty. It found all defendants were controlled by McLean and acted in concert with McLean with regard to the breaches of fiduciary duty and fraud. It, therefore, ordered that liability for forfeiture extended to all defendants, not just MCL Management.

Defendants assert MCL Management was not a fiduciary of OTD and, therefore, should not have been ordered to disgorge fees it had properly earned. They argue MCL Management's relationship to OTD was purely contractual and its duties were not fiduciary in character. They assert MCL Management's duties consisted of ministerial bookkeeping and day-to-day handling of bills, subject to the control of the manager of OTD (*i.e.*, MCL or PAM), and that the manager of OTD bore the fiduciary duty of overseeing MCL Management.

"To recover for breach of a fiduciary duty, a plaintiff must prove that a fiduciary duty exists, that the fiduciary duty was breached, and that the breach proximately caused the injury of which the plaintiff complains." *Crichton v. Golden Rule Insurance Co.*, 358 Ill. App. 3d 1137, 1149 (2005). A fiduciary relationship exists where, by reason of friendship, agency, or business association and experience, trust and confidence are reposed by one party in another and the latter party gains an influence and superiority over the first as a result. *Maercker Point Villas Condominium Ass'n v. Szymski*, 275 Ill. App. 3d 481, 484 (1995). In a corporate setting, a fiduciary has the duty to act with utmost loyalty and good faith in managing the corporation. *Maercker Point Villas Condominium Ass'n*, 275 Ill. App. 3d at 484. It breaches that duty if it uses corporate assets to further its own goals or enhances its own personal interests at the expense of the corporate interests. *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 369 (1994); *Maercker Point Villas Condominium Ass'n*, 275 Ill. App. 3d at 484. A fiduciary is not allowed to use the corporation's assets without compensating the corporation and

39

should not put himself in a position of conflict where he is tempted to use corporate assets for his own purposes. *Levy*, 268 Ill. App. 3d at 369.

It is undisputed that McLean, MCL and PAM had a fiduciary duty to OTD and they breached that duty. MCL and PAM each had been the named manager of OTD pursuant to the operating agreement and McLean was the manager of both MCL and PAM. The other members of OTD were, by McLean's design, silent participants in the business, necessarily trusting and relying completely on the manager in running the company. McLean testified that, as manager of OTD, he could do pretty much anything he liked and freely admitted he made transfers from OTD to his other business entities as needed for the cash flow of his other enterprises. He stated he took the interest-free "loans" as compensation for developing Piper's Alley from a $1.5 million investment into a $15 million investment without charging for his services.

McLean's accountant testified the transfers were not for OTD's benefit but for the benefit of McLean's other enterprises. She also testified that OTD was short on funds and unable to meet its mortgage and tax obligations as a result of the transfers, resulting in late fees and penalties. She stated she hid the transfers from Tully. She made the transfers by wiring funds rather than writing checks so that she would not have to get Tully's signature on any check over $5,000, as McLean had agreed in 2002. She also posted the transfers in fictional accounts so that Tully would not notice them . McLean, MCL and PAM breached their fiduciary duty to OTD and plaintiffs when they used OTD's resources for their own benefit, failed to compensate OTD for that usage

40

and actively worked to hid that usage from the other members of OTD.

Pursuant to the management agreement between OTD and MCL Management, MCL Management was the manager for the Piper's Alley complex, OTD's sole asset. It was OTD's exclusive agent for the day-to-day operations of Piper's Alley, responsible for maintaining the complex, renting the space, dealing with tenants, collecting rent, and maintaining the appropriate records. Normal trust between contracting parties does not turn a contractual relationship into a fiduciary one. *In re Estate of Long,* 311 Ill. App. 3d 959, 966 (2000). But the trust here was more than normal trust. The essence of a fiduciary relationship is that one party is dominated by another; the presence of a significant degree of dominance and superiority. *Lagen v. Balcor Co.,* 274 Ill. App. 3d 11, 21 (1995). That degree of dominance and superiority exists here. OTD and plaintiffs were completely dependent on OTD's manager to run the company. The OTD members gave up all control over the company to the manager on the basis of promised high returns. The manager of OTD was also the manager of MCL Management.

As the court found and the testimony of McLean and his accountant shows, all defendants, MCL Management included, were controlled by McLean and acted in concert with him with regard to the breaches of fiduciary duty. MCL, PAM and MCL Management were basically the same entity. McLean operated his 50-some business entities together, using MCL Construction as the clearing house for all transfers to and from the businesses. McLean was the manager for each business entity and used the

same accounting staff to coordinate the finances of all of them. All McLean's businesses were tied together by a web of transfers in and out of essentially a common fund memorialized on MCL Construction's books. MCL Management was part of that web. It was managed by the same man that, in his capacity as manager of MCL and PAM, managed OTD. The same man who ordered that funds to be siphoned from OTD and sent to unrelated entities and that evidence of those transfers be hidden from plaintiffs. All McLean controlled businesses acted together. As the court held, MCL Management was clearly a fiduciary of OTD and breached that duty by cooperating in the scheme.

The court did not abuse its discretion in ordering forfeiture of the management fees. There is no question that MCL Management/defendants worked to earn the management fees but, as discussed previously, there is also no question that defendants breached their fiduciary duty to OTD in a wilful and deliberate way for many years. They failed to be truthful and candid with plaintiffs and used corporate assets for their own gain with reimbursing OTD. The record supports the court's finding that defendants perpetrated "egregious conduct by the misappropriation of significant funds" throughout the long history of the project and worked together to accomplish this. Full forfeiture of all compensation was warranted.

### B. Brokerage Fees Paid to MCL

Defendants argue the court erred in ordering defendants to reimburse plaintiffs for two separate "loan fees" transferred from OTD, one for $100,000 and one for

42

$170,000. The transfers were allegedly for loan fees MCL earned for arranging the refinancing of OTD's debt in October 2003 and in February 2005. The court found no justification in the operating agreement for the charge to OTD of the fees and that the fees were a veiled attempt to siphon additional funds from OTD for McLean's benefit. It found, additionally, even if the fees were appropriately paid, they were to be forfeited as a result of McLean's breach of fiduciary duties.

Defendants asserts the fees were "loan brokerage fees," legitimately earned by MCL in procuring two financial arrangements for OTD and commensurate with fees charged for similar services in the Chicago market. They argue MCL, as OTD's manager, had the authority to contract with McLean-related entities and just because there was no express authority for this particular contract or financial service in OTD's operating agreement does not mean the fees were not justified. They also assert the court ordered the forfeiture as a punishment to McLean and not as a compensatory measure.

The court did not err in ordering forfeiture of the fees. The record supports the court's finding that the fees were actually misappropriations. First, OTD's management agreement contains no provision that loan or brokerage fees will be paid to the manager, whether MCL or PAM, or to an affiliate of the manager. Granted, the manager has complete authority to contract with other McLean entities but there is no evidence of any contract committing OTD to pay loan fees to anyone. Second, as plaintiffs point out, the fees were posted only five days apart, one at nine months after the 2003

43

refinancing and the other at seven months before the 2005 refinancing, making their actual connection with the loans questionable.  Lastly, the fees were listed on MCL Construction's master ledger as being "asset management fees," which are (a) not the same as loan brokerage fees and (b) clearly not authorized under the operating agreement because, as McLean testified, he decided not to charge OTD asset management fees for his services.

All in all, we agree with the court that the "loan fees" were nothing more than another way of hiding inappropriate transfers and should be forfeited because they were not actually earned and the improperly transferred funds belong to OTD.  The court did not err in ordering forfeiture of the loan fees.

### C.  13% Interest Rate

Defendants argue the court erred in awarding plaintiffs 13% prejudgment interest on the misappropriated funds.  Prejudgment interest is proper when authorized by statute, agreement of the parties or warranted by equitable considerations.  *Progressive Land Developers, Inc. v. Exchange National Bank of Chicago*, 266 Ill. App. 3d 934, 945 (1994).  "In cases involving a breach of fiduciary duty, the rationale behind an award of interest is to make the injured party whole by forcing the fiduciary to account for profits gained from his use of the injured party's funds." *Progressive Land Developers, Inc.*, 266 Ill. App. 3d at 945 (citing *In re Estate of Wernick*, 127 Ill. 2d 61, 87 (1989)).  The determination of whether equitable circumstances support an award of interest lies within the discretion of the trial court.  *In re Estate of Wernick*, 127 Ill. 2d at 87. We will

44

not disturb such a determination barring an abuse of that discretion. *In re Estate of Wernick*, 127 Ill. 2d at 87.

Defendants agree that the equitable circumstances warrant awarding plaintiffs prejudgment interest on the interest-free "inter-company loans" from OTD. They assert, however, that the 13% interest rate is too high and an abuse of discretion because the prime rate during the time was 4.6% and there was no showing that OTD could generate anything close to 13% by lending those funds to other businesses or purchasing debt instruments at that time. They argue the 13% rate is punitive, rather than fair and equitable, and an abuse of discretion in the setting of equitable interest.

The court did not abuse its discretion in setting the 13% interest rate. There is no requirement that the court award only the prime rate or prime rate plus 1%. "[I]n equity the amount of interest allowed need not fall within any precise terms." *In re Estate of Wernick*, 127 Ill. 2d at 87. To paraphrase the court, while McLean could have borrowed from a bank at a rate of prime plus 1%, he did not do so. Instead, he misappropriated funds from a private company and he is, therefore, not entitled to benefit from the bank rate. As the court stated, the true measure of damages is not what defendants would have had to pay had McLean conducted himself appropriately but rather what the wrongful conduct cost the victim, the cost of the loss of use of the funds. *Progressive Land Developers, Inc.*, 266 Ill. App. 3d at 945; *In re Estate of Wernick*, 127 Ill. 2d at 87. The plaintiffs requested a 13% interest rate based on a 2001 loan agreement between McLean and one of his other business enterprises, 455 Central Park West, LLC, a

45

development in New York City. Under that agreement, 455 Central Park West, LLC agreed to borrow money from McLean at a rate of 13% interest. So, apparently, 13% is a reasonable rate of interest for a loan between an individual and a private business. Given the circumstances of the case, 13% prejudgment interest was not excessive compensation to plaintiffs for McLean's taking the "interest-free loans" and the court did not abuse its discretion in entering the award.

For the reasons stated above, we affirm the court's judgment against LPDA, its judgment ordering forfeiture of management fees and its compensatory and punitive damage awards. We reverse the court's order denying defendants' counterclaim for dissolution of OTD and order the case remanded for further proceedings.

Affirmed in part and reversed in part; cause remanded.

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each case)

---

THOMAS M. TULLY, Trustee of the Thomas M. Tully Trust, and F.P.A., LLC, an Illinois Limited Liability Company, Individually and Derivatively on Behalf of Old Town Development Associates, LLC,

      Plaintiffs-Appellees,

v.

DANIEL E. McLEAN, PIPER'S ALLEY MANAGEMENT, INC., an Illinois Corporation, LINCOLN PARK DEVELOPMENT ASSOCIATES, LP, an Illinois Limited Partnership, MCL COMPANIES OF CHICAGO, INC., an Illinois Corporation, MCL MANAGEMENT CORPORATION, an Illinois Corporation, and OLD TOWN DEVELOPMENT ASSOCIATES, LLC, an Illinois Limited Liability Company and Nominal Defendant,

      Defendants-Appellants.

---

No. 1-09-2976

Appellate Court of Illinois
First District, Second Division

April 26, 2011

---

JUSTICE KARNEZIS delivered the opinion of the court.

CUNNINGHAM, P.J., and HARRIS, J., concur.

---

Appeal from the Circuit Court of Cook County.

The Honorable Stuart E. Palmer, Judge Presiding.

---

For APPELLANTS:  Brown, Udell, Pomerantz & Delrahim, Ltd., of Chicago (Glenn L.

1-09-2976

Udell, David A. Epstein, Lauren C. Walsh and Amanda C. Jones, of counsel)

For APPELLEES:  Nisen & Elliott, LLC, of Chicago (Michael H. Moirano and Claire E. Gorman, of counsel)