2022 IL App (1st) 201138-U

No. 1-20-1138

Order filed March 25, 2022

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| TECHNO MAGNETIC MEDIA AND COMPUTER SUPPLIES, INC., an Illinois Corporation, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff and Counterdefendant-Appellant, | ) ) | |
| v. | ) ) | No. 09 CH 44544 |
| | ) | Honorable |
| LINDA WILLIAMS, an individual, and LW FINANCING, LLC, an Illinois Limited Liability Company, | ) ) ) ) | Michael T. Mullen, Judge, Presiding. |
| Defendants, | ) | |
| (Techno Magnetic Media and Computer Supplies, Inc., Plaintiff and Counterdefendant-Appellant, Moshe Kedar, Counterdefendant, Third-Party Defendant, Third-Party Counterplaintiff-Appellant v. Linda Williams, Defendant, Counterplaintiff, Third-Party Plaintiff, Third-Party Counterdefendant, Third-Party Counterdefendant-Appellee). | ) ) ) ) ) ) ) ) | |

JUSTICE SHARON ODEN JOHNSON delivered the judgment of the court.
Presiding Justice Pierce and Justice Mikva concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's entry of judgment for breach of fiduciary duty in favor of appellee; we reverse the circuit court's award of compensatory and punitive damages directly to the nominal plaintiff in a derivative suit; we affirm the circuit court's calculation of compensatory damages because it was not against the manifest weight of the evidence; we affirm where appellants had no standing to challenge the payment of defendant's attorney fees by an LLC that they were not members of; we affirm the circuit court's denial of relief sought in their motion to reconsider where appellants failed to supply a complete record on appeal.

¶ 2    This appeal arises from an initial complaint filed in equity by Techno Magnetic Media & Computer Supplies, Inc. (Techno) against defendants Linda Williams (Williams) and LW Financing LLC (LWF) based on allegations of breach of fiduciary duty, conversion, fraud, and deceit. That initial complaint ultimately led to the filing of four additional crossclaims, counterclaims, and third-party complaints between the initial parties and other related parties, as will be further explained below. On appeal, plaintiff and counterdefendant Techno and third-party defendant, third-party counterplaintiff Moshe Kedar (Kedar) contend that: (1) the circuit court incorrectly entered judgment on issues not plead by any party (third-party complaint); (2) the circuit court did not correctly assess damages in a derivative action (third-party complaint); (3) the circuit court did not correctly assess punitive damages against Kedar (third-party complaint and counterclaim); (4) the circuit court did not properly determine compensatory damages (complaint and third-party countercomplaint); (5) the circuit court improperly allowed Williams to use contested funds to pay her attorney fees; and (6) the circuit court incorrectly refused to order Williams to pay taxes and transfer costs for properties transferred as a result of the litigation. For the following reasons, we affirm in part and reverse in part.

¶ 3                                    BACKGROUND

¶ 4                                    A. Introduction

¶ 5     This case is as convoluted as it is contentious. During the parties' bench trial, the circuit court received approximately 500 documents and heard testimony from multiple witnesses, resulting in a 79-page memorandum opinion and order from the circuit court. For clarity, we begin by providing general background information about the parties, their relationships, and the origins of this case.

¶ 6                                  B. The Parties

¶ 7     Techno originated as a sole proprietorship owned by Kedar in 1985. Kedar operated Techno in California and Techno sold computer-related supplies. In 1989, Kedar and Techno moved to Chicago. Techno was subsequently incorporated in Illinois with Kedar as its president and majority shareholder.[1] Techno is the plaintiff, counterdefendant, and an appellant in this appeal. Kedar is a third-party defendant, third-party counterplaintiff, and an appellant in this appeal.

¶ 8     Williams was an employee of Techno for 19 years. During the course of her employment, she became an officer of Techno but resigned in October 2009. Williams is also the sole member and manager of LWF. She is a defendant, counterplaintiff, third-party plaintiff, third-party counterdefendant, and appellee in this appeal.

¶ 9     LWF is an Illinois limited liability company (LLC) that was established in 2007. LWF was the record owner of 18 properties that were the subject matter of part of the circuit court proceedings. LWF is a defendant and counterplaintiff and is not a party to this appeal.

¶ 10    Kedar was also an 80% owner of Dafna, Inc. (Dafna). Dafna is a manager-managed New York LLC that was organized in 1999 with Kedar as its sole manager. The original members of

---

[1] Techno was no longer in business at the time this appeal was filed.

Dafna were Kedar (70%), Williams (20%) and Ronnie Shub (10%). Kedar bought Shub's shares in 2010 or 2011. Dafna is also a majority owner of Bronzeville Holdings LLC (Bronzeville). Bronzeville is a manager-managed Illinois LLC organized on March 19, 2002. The managers of Bronzeville are Donald Williams (Donald) and Vernon Williams (Vernon), who each own 15.96%, and Dafna, represented by Williams, which owns 68.08%. Dafna was a third-party plaintiff and is not a party to this appeal.

¶ 11    Vered Rom-Kedar (Rom-Kedar) is Kedar's wife who was also an officer of Techno. She was a third-party defendant and is not a party to this appeal.

¶ 12                                    C. Origins of the Case

¶ 13    Techno filed its initial complaint against Williams and LWF on November 10, 2009, alleging breach of fiduciary duty, conversion, fraud, and deceit. Williams and LWF in turn filed a combined counterclaim and third-party complaint on February 25, 2010. The counterclaim, filed against Techno, alleged slander, breach of fiduciary duty, defamation, breach of contract, recission and duress, and sought a declaratory judgment. The third-party complaint was a derivative action filed by Williams in her roles as a shareholder of Techno and a member of Dafna against Kedar, and alleged claims of defamation *per se*, breach of contract and breach of fiduciary duty. Kedar responded with a third-party counterclaim against Williams for breach of fiduciary duty and conversion. Dafna also filed a third-party counterclaim against Williams for breach of fiduciary duty and sought both an accounting and a mandatory injunction.

¶ 14    The trial proceeded on Techno's verified three-count amended complaint filed on September 9, 2011, against Williams and LWF; Kedar's two-count third-party counterclaim against Williams filed September 9, 2011; four counts of Williams' second amended counterclaim

against Kedar filed on March 16, 2011; and counts I and III of Dafna's counterclaim against Williams filed on September 15, 2011.

¶ 15    Count I of Techno's amended complaint was directed against both Williams and LWF, while counts II and III were directed against Williams individually. Count I alleged that Williams and LWF breached a fiduciary duty to Techno by illegally removing money from Techno and transferring it to LWF without Kedar's authorization. Techno further alleged that LWF and Williams then used Techno's funds to purchase and renovate multiple rental properties. Further, Techno alleged that Williams used various amounts of Techno's money to improperly pay for personal expenses, failed to properly distribute the sales proceeds after one of the rental properties was sold, and she improperly removed business records and other data from Techno's premises. Count II, conversion, alleged that Williams improperly transferred money that was used to purchase the rental properties and that she exerted sole ownership over the rental properties. Count III asserted that Williams engaged in fraud and deceit when she improperly transferred Techno's money to LWF and then used the money to purchase the rental properties. Techno further alleged that Williams made false entries in Techno's books to conceal the alleged unauthorized transfers, and that she falsely informed Kedar about the accuracy of Techno's books. Additionally, when confronted about the allegedly unauthorized transfers, Williams refused to return any of Techno's assets or relinquish control over the rental properties.

¶ 16    In their verified answer, Williams and LWF denied all of the material allegations. Kedar, in his personal capacity, filed a two-count third-party counterclaim against Williams for breach of fiduciary duty and conversion. Counts I and II of Techno's amended complaint and counts I and

II of Kedar's third-party counterclaim are based on the same facts and are related to the rental properties and some of the specific transfers that Williams made.

¶ 17    Williams' second amended counterclaim was also heard at the bench trial. Although her initial counterclaim had 11 counts filed against Techno, Kedar, and Dafna, summary judgment was granted in favor of Kedar and Techno on count VIII prior to trial. The remaining counts of her second amended counterclaim were either voluntarily dismissed or dismissed with prejudice. Those counts alleged that Kedar was liable for defamation *per se*, breach of contract, and breach of fiduciary duty.

¶ 18    Finally, the trial also included Dafna's three-count counterclaim against Williams. Count I sought damages for breach of fiduciary duty, count II sought an accounting from Williams, and count III sought a mandatory injunction to require the Clerk of the Court of Cook County to release funds that were being held from the sale of the Bronzeville property directly to Dafna. However, the circuit court found that Dafna abandoned count II at trial and dismissed it with prejudice.

¶ 19                        D. Historical Facts

¶ 20    In 1991, Williams was hired by Kedar as Techno's bookkeeper/office manager at an annual salary of $33,000. Williams became Kedar's "most trusted employee" and was responsible for all of Techno's administrative tasks as well as attending to some of Kedar's personal tasks, including assisting with the preparation of his tax returns. Although Kedar and Williams reviewed Techno's financial records together at the end of each year, Williams was responsible for working with Techno's accountants to complete Techno's corporate tax returns based on the records that Kedar approved. In or about 1999, Williams was promoted to the position of general manager and became an officer of Techno as well as a 5% shareholder. Kedar

owned the remaining 95% of Techno. Williams was listed as an officer on Techno's tax returns and Illinois Secretary of State (Secretary of State) filings. Williams represented herself as an officer of Techno in email correspondence with Techno's broker, and she signed documents, including Techno's trade secret agreements, in her capacity as an officer. Williams was still a 5% shareholder and officer when she resigned in October 2009.

¶ 21    From the time of her 1999 promotion until her 2009 resignation, Williams earned an annual salary of $72,000. She also received an annual bonus that was determined by Kedar, and additional employee benefits including cleaning services at her personal residence. Those benefits were with Kedar's knowledge and his specific approval.

¶ 22    LWF was formed in 2007 with Williams as its sole member and manager. The circuit court specifically found that the details relative to its formation were "important to understand as it gives insight into the merits and lack of merits of Kedar's allegations. * * * [B]ased on this court's evaluations of Kedar's testimony that although Kedar was sometimes truthful, he was frequently untruthful. * * * Kedar had no problem spinning several tall tales when it came to describing both the creation of LWF and his knowledge of Williams' activities that pertained to the acquisition and management of the rental properties that were purchased."

¶ 23    In approximately 2006 or 2007, Kedar, who was an Israeli citizen, learned that the tax laws of Israel had changed in 2003 and that the changes significantly affected his personal Israeli income tax liability.[2] As a result, Kedar consulted with his accountant, Hillel Steinberger (Steinberger), to obtain advice on how he could reduce his Israeli tax liability. Steinberger advised

_____

[2] An Israeli citizen who owned 10% or more of an ongoing entity and who received income from that entity would be taxed at that person's marginal tax rate, which could reach as high as 50% on income over $150,000.

Kedar that if an intermediate company loaned money to a corporation that it did not have a significant interest in, then the interest from the loan would be taxed at 15%, if the loan was not linked to exchange rates or changes in the consumer price index, or 20% if it could. Steinberger advised Kedar that an American company that was not partially or fully owned by Kedar could loan Techno money without Kedar incurring any additional tax liability in Israel.

¶ 24    Based on this advice, on October 14, 2007, Kedar sent Williams an email and directed her to create an entity known as LWF of which she would be the sole owner. Kedar told her that LWF would charge Techno interest for an owner's loan, and that Techno would pay LWF "interest" once a year which LWF would then pay to Williams and Kedar. Despite this agreement, there was no financing or loan agreement between Techno and LWF, and LWF never loaned Techno any money. Williams created LWF as directed by Kedar; however, an issue arose when Williams abruptly resigned from Techno in 2009, and she had full control and ownership of 19 rental properties that were solely titled in LWF's name, as will be further discussed below.

¶ 25    When Techno's then existing business began to fail, Kedar and Williams decided to pivot Techno in a different direction by purchasing, rehabilitating, and renting residential properties. Kedar and Williams agreed that LWF would purchase the properties, and in September 2008, LWF began purchasing properties in accordance with their plan. LWF purchased a total of 19 properties in its name (the properties). The circuit court specifically found that both Kedar and Williams intended to ultimately transfer the properties into another entity that would be owned by Kedar and Williams at a later date, with a 70/30 ownership split: Kedar owning 70% and Williams owning 30%. With that plan in mind, Kedar directed Williams to form an entity in which Kedar,

Williams and Kedar's longtime acquaintance Shub would be members. However, Kedar subsequently changed his mind about Shub's involvement.

¶ 26    Kedar then requested that Williams set up an entity with the Secretary of State that was referred to as ML Realty Service. This entity was designed to ultimately hold the title to the properties previously purchased by LWF as well as any future properties purchased by Williams and Kedar. On February 18, 2009, Williams emailed Kedar and informed him that the name was unavailable, so she set it up as MKLW Realty Services (MKLW). Articles of Organization for MKLW were then filed with the Secretary of State. An operating agreement for MKLW was drafted, but never signed by the parties. The unsigned MKLW operating agreement provided that the members' interests would have been: Kedar: 25%, Williams: 30%, Rom-Kedar: 20%, and MK 1999 Children's Trust, with Kedar as trustee: 25%. MKLW's name was changed to "Dafna Realty Partners, LLC" (Dafna Realty)[3] because Kedar did not like the MKLW name and did not want the properties transferred to it. In March 2009, Dafna Realty was registered with the Secretary of State. On April 28, 2009, Kedar sent an email to attorney Earl Weiss (Weiss), who was drafting the Dafna Realty operating agreement, in which Kedar made clear that he wanted Dafna Realty to be the general partner and management company for the properties and that an unnamed entity would be the investor/limited partner. Later that same day, Kedar indicated that he wanted the members of Dafna Realty to be his son, Guy, and Williams, with a 70/30 split in ownership.[4]

¶ 27    A checking account for Dafna Realty was opened on May 7, 2009, with an opening balance of $7000. On May 19, 2009, an additional $400,000 was deposited into the account. Also on May

_____

[3] Dafna was Kedar's daughter's name.
[4] Williams would own the 30%.

19, 2009, Kedar emailed Weiss and indicated that he wanted to form an entity that would serve as Dafna Realty's manager, that Dafna Realty should designate a series LLC, but also stated that Techno should act as the manager of Dafna Realty. After the email was sent, Kedar told Williams to file certificates of designation for five series LLCs under Dafna Realty and that once the designations were filed, he wanted to open bank accounts for each series as he intended to purchase properties under each series.

¶ 28    On May 27, 2009, Williams sent Kedar an email stating that Kedar, Weiss and Steinberger were all in agreement that certificates of designation could not be filed until a management/manager company was created and a determination was made regarding how the tax returns would be handled. On June 8, 2009, Kedar again directed Williams to make changes to Dafna Realty; this time to change the name to Midnight Properties, LLC, which would be the master of a series. Kedar also wanted to change Midnight Properties to a single member LLC, with that member being another of his sons, Gil. Kedar also requested that a new entity, Dafna Property, LLC (Dafna Property) be formed to act as the manager of Midnight Properties. Kedar wanted Dafna Property to be owned 30% by Williams and 70% by Guy, with Kedar acting on Guy's behalf as manager.

¶ 29    Midnight Properties was then registered with the Secretary of State in July 2009. On July 20, 2009, Weiss emailed Kedar and informed him that a separate operating agreement would need to be created for any management company designated by Kedar and which addressed the possible return and distribution of funds from any outside investors. Certificates of designation were then filed with the Secretary of State on July 29, 2009, for four series LLCs under Midnight Properties.

¶ 30    On August 10, 2009, $404,500 was withdrawn from the Dafna Realty bank account and the account was closed. That same day, accounts were opened at another bank for: Midnight Properties LLC Broadview Series with a deposit of $100,000; Midnight Properties LLC Bellwood Series with a deposit of $100,000; Midnight Properties LLC Maywood Series with a deposit of $100,000; Midnight Properties LLC Chicago Series with a deposit of $8500; and Midnight Properties LLC with a deposit of $100. The circuit court found this background information important because Kedar claimed that Williams made a false representation to him when she told him she would transfer the properties owned by LWF to an entity controlled by Kedar when she had no intention to do so. Kedar testified that Williams refused to follow his directives and establish a company that he formed from overseas so that the LWF properties could be transferred into it, which the court found was false. Instead, the circuit court specifically found that while an entity was finally established to receive the properties from LWF, Kedar wavered on the name of the company, the membership of the company, and the management of the company. The court also found that: Kedar told Williams that he did not want the properties transferred to MKLW; at all times, Williams informed Kedar of the details of each of the property purchases, including the purchase price; that Kedar specifically agreed that Williams should purchase each of the 19 properties; and not one of the properties was purchased without Kedar's specific knowledge or agreement. Additionally, the circuit court found that Kedar was fully aware that LWF would hold the title for each of the properties and also that he agreed that LWF would be the titleholder.

¶ 31    With respect to the parties' contributions to the funding of LWF, the original agreement between Kedar and Williams was that Williams would invest $300,000 and Kedar would invest $700,000 resulting in a 70/30 ownership split of rents and expenses. However, the plan did not

materialize as discussed. It was undisputed that 19 properties were purchased at a total price of $942,185. On October 19, 2009, Williams resigned from Techno. After her resignation, LWF sold one of the properties, 450 Englewood, Hillside, Illinois (Hillside property) for $150,000 on October 23, 2009. The property was purchased on May 20, 2009, for $64,000, and the sale resulted in a $130,336 distribution to LWF. None of the money for the Hillside property was ever distributed to Techno or Kedar. It was further undisputed that the remaining 18 properties had a collective fair market value of $2.25 million. The circuit court ultimately determined that Williams contributed $192,000 to LWF for its use and specifically for the purchase of the 19 properties. The court found that Williams was not entitled to take sole possession and control over all of the properties by excluding Techno and Kedar from any participation.

¶ 32    Regarding questionable financial transactions by Williams, the court found that: Kedar was intimately involved with the transactions; he had access to Techno's computer system, even when he was in Israel; and he was kept well-informed about Techno's business as all documents related to LWF's purchase of the 19 properties were scanned and saved to Techno's computer system. The court specifically found that Kedar gave Williams specific authorization to make each of the indicated wire transfers so that LWF would have the necessary funds to make the planned property purchases, and further that Kedar authorized each expense that Techno paid on Williams' behalf.

¶ 33    With respect to the properties, the court found that the disputed issue was the amount of adjusted income after repairs were completed. The court also found that Williams had not retained any of LWF's profits because LWF had operated at a loss since 2009; any rental income that was generated was used to rehabilitate the properties, which was reasonable and necessary.

¶ 34    Dafna is a manager-managed LLC organized on April 23, 1999, under the laws of the State of New York, and was managed by Kedar. Although a written operating agreement was prepared for Dafna, it was not fully acknowledged, executed, and ratified until August 2015. As previously stated, the original members of Dafna were Kedar, with 70% ownership, Williams, with 20% ownership, and Shub, with 10% ownership. Kedar purchased Shub's shares sometime in 2010 or 2011. The Dafna operating agreement indicated that the sole purpose of the company was to own, hold, improve, manage, operate or sell the real property known as 73 Washington Avenue (Washington Avenue property) in Brooklyn, New York; to incur indebtedness, secured and unsecured; to mortgage, finance, refinance, encumber, lease, sell, exchange, convey, transfer or otherwise deal with or dispose of the property; to enter into and perform contracts and agreements of any kind necessary to, in connection with, or incidental to the business of the company; and to carry on any other activities necessary to, in connection with, or incidental to the foregoing, as the company in its discretion may deem desirable. Kedar was responsible for the day-to-day management of the business and affairs of the company and the property. Additionally, Kedar had the right to make all decisions with respect to the refinance or sale of the property.

¶ 35    Bronzeville, a manager-managed LLC, purchased property located at 4000 South Federal Street (State property) in Chicago in June 2003. However, it was involuntarily dissolved by the Secretary of State for failure to file its annual reports. In 2007, the dissolved Bronzeville received a letter of interest regarding the potential purchase of the State property; at which time Dafna became aware that Bronzeville was dissolved. Bronzeville's members were Dafna, Donald and Vernon, with Williams representing Dafna's interest. Dafna's initial investment into Bronzeville was a capital contribution of $466.45 and a loan of $128,000. In August 2009, Bronzeville sold

the State property for $1.3 million, which created conflict between Kedar, Donald and Vernon because Donald and Vernon wanted a cash distribution from the sale of the State property.

¶ 36    In October 2009, Williams sought counsel from Attorney Axelrod to help her separate herself from Kedar and their various business endeavors/entanglements. Axelrod drafted a resolution relating to distributions from and dissolution of Bronzeville, which would have given Williams $102,240.92 which was her share as a member of Dafna. On October 15, 2009, Donald, Vernon, and Williams met and executed the resolution; Kedar was not invited to the meeting and was unaware of the meeting. Axelrod also drafted a letter of resignation for Williams, and the letter, along with a $162,167.99 check payable to Kedar that referenced a loan repayment, were sent to Kedar. The court found that Kedar did not agree to or in any way authorize the distribution of the State property sales proceeds directly to any of Dafna's members, nor did he authorize Williams to make a distribution directly to any of Dafna's members for any loan repayment that Dafna made to Bronzeville.

¶ 37    Subsequently, Williams and Kedar disagreed about the management and renovations of the properties as Kedar wanted Gilad Itzhaki (Itzhaki) to manage the properties. On October 19, 2009, Williams' resignation letter was sent to Kedar in Israel via Federal Express, and a copy was also delivered to Techno's office. The resignation letter indicated that as the sole owner of LWF, Williams rejected his request to have Itzhaki manage the properties or LWF. On October 20, 2019, Guy went to Techno's office to send Williams' resignation letter directly to Kedar. Williams testified after her resignation from Techno on October 19, 2009, she copied records from Techno, Dafna, and LWF as well as her own personal and corporate electronic records and emails that were stored on Techno's computer system onto a previously purchased hard drive and removed those

records from Techno's office. She also removed hard copies of LWF's checkbook and records from Techno's office. The court found that Williams was not entitled to make copies of the Techno and Dafna books and records for her own use.

¶ 38     With respect to the defamation count (count V) of Williams' second amended counterclaim against Kedar, the court found that Kedar admittedly told at least 36 people that Williams embezzled and/or stole funds or assets from Techno and/or Kedar. Williams admitted that upon her resignation, she took Techno and Dafna's property data and records that did not belong to her. She also took Kedar's and Techno's property in the form of the money used to finance LWF's purchase of the properties. The court found Kedar's statements that Williams stole and/or embezzled money and property from Techno and Kedar were accurate or substantially true. Regarding count VI, breach of contract, the court found that there was insufficient evidence to conclude that a contract existed, much less that Kedar breached any such contract.

¶ 39     The court did however find that Kedar breached his fiduciary duty to Dafna (count X of Williams' second amended counterclaim). The court determined that collected cash rents for the Washington Avenue property were either deposited directly into Kedar's bank account, given directly to Kedar, or given to Shub. In March 2014, Kedar entered into a contract to sell the Washington Avenue property for $2.4 million. The court noted that at that time, the present litigation was entering its fifth year and Kedar and Williams were the only two members of Dafna. Dafna was unable to obtain title insurance for the property because it did not have a signed operating agreement and Dafna could not provide evidence of Williams' consent to the sale. Dafna was thus required to place $560,944.22 (Williams' 20% interest in the sales proceeds plus an additional $100,000 to protect the title company) in escrow, which Kedar provided on Dafna's

behalf. Kedar determined that he wanted to do an exchange under section 1031 of the Internal Revenue Code (26 U.S.C. §1031 (2000)) (1031 exchange) with the Washington Avenue property's sales proceeds. Dafna successfully replaced the Washington Avenue property with two additional properties, the Baltimore property in Maryland for $1.333 million, and the Laredo property in Texas for $923,000. Both were rented at the time of Dafna's purchase; the Baltimore property for $5833.34 per month, and the Laredo property for $5500 per month. In August 2015, Dafna, Kedar and Williams executed a Memorandum of Understanding (MOU) related to Dafna's July 10, 2014, sale of the Washington Avenue property, that was effective as of July 9, 2014. As part of the agreement, Williams executed Dafna's operating agreement and agreed to the sale of the Washington Avenue property as well as the purchase of the replacement properties which completed the 1031 exchange, and the escrow funds were released to Kedar. The court found that Kedar or anyone on behalf of Dafna ever provided Williams with a monthly balance sheet, profit and loss statements, annual report, statement of the balance in Dafna's capital accounts or other relevant financial information for tax purposes as required by the Dafna operating agreement. Kedar also never distributed any of the rental cash from Dafna to Williams.

¶ 40     Kedar sold the Laredo property in July 2018 without Williams' knowledge or consent for just under $900,000. Kedar did not provide any documentation to Williams related to the Laredo property sale or any documentation related to the finances of the Laredo property. At the time of trial, Dafna still owned the Baltimore property, but had similarly never given Williams any documentation or financial information related to the property, nor given her any distribution of funds related to collected rents.

¶ 41                         E. The Circuit Court's Conclusions of Law

¶ 42                    1. Techno and Kedar v. Williams and LWF

¶ 43    With respect to Techno and Kedar versus Williams and LWF, the court found that Williams owed both Techno and Kedar a fiduciary duty of loyalty and care in her role as an officer, valued employee, and friend. The court found that she breached her fiduciary duty by removing Techno's data from the office, retaining profits from the sale of the Hillside property, and refusing to provide Kedar and Techno with ongoing reports on the status of the properties, which they were entitled to as they provided significant funding for the purchase of the properties. However, the court found that LWF did not have a fiduciary duty to either Techno or Kedar as neither were members nor had ever been members of LWF.

¶ 44    The court also found that Williams abused her fiduciary relationship with Techno and Kedar by exerting total control and ownership over the properties and refusing access to them. Additionally, despite demands, Williams refused to transfer any one of the properties to either Techno or Kedar, thereby establishing their claims of conversion.

¶ 45    The court then found that Techno and Kedar sustained identical injuries on their respective counts for breach of fiduciary duty and conversion against Williams, therefore the court awarded collective damages. The court noted that given both Williams' and Kedar's conduct, devising the remedy was challenging. The court found that the value of the 18 properties increased from the purchase price of $859,500 to $2.25 million. Additionally, the court noted that on October 23, 2009, Williams sold the Hillside property for $150,000 and LWF received $130,336 from the sale, while neither Kedar nor Techno received any of the sales proceeds. The court opined that the money was not Williams' to keep and use without Kedar's consent, and that she had to forfeit the $130,336 to Techno and Kedar. Further, the court found that the total purchase price for the 19

properties was $942,185, of which Techno/Kedar contributed $750,185 and Williams contributed $192,000, which was an 80/20 contribution split. The court reasoned that given the current significant value of the properties, it would be inappropriate to use a valuation as of the date of conversion as it would result in a windfall profit to Williams. The court thus determined that the remaining 18 properties should be split 80/20 to reflect their contributions. No damages were awarded to Techno/Kedar based on rental income, nor were damages awarded to Williams for a management fee of the properties. The court ordered the properties placed into a constructive trust and split 80/20 between Techno/Kedar and Williams based on the current value. Williams was additionally ordered to pay Techno/Kedar $130,336 from the proceeds of the previous Hillside property sale.

¶ 46    The court declined to find Williams liable for fraud and deceit, finding that Techno did not meet its burden as to each element. Similarly, the court declined to award Techno/Kedar punitive damages because it did not believe that Williams would commit similar wrongs in the future and that the remedy awarded was more than fair and reasonable under the circumstances.

¶ 47                        2. Dafna, LLC v. Williams

¶ 48    The court found that Williams was empowered to exercise significant managerial control over Dafna's business as it related to Bronzeville and that she breached her fiduciary duty. Williams breached her duty when she facilitated the distribution of the Bronzeville sale proceeds without authority, and the court entered judgement in favor of Dafna in the amount of $199,695.04. The court ordered the Clerk of the Circuit Court to make a direct distribution of the proceeds, held in its possession, to Dafna. The court also ordered that the distribution and any accrued interest would constitute an offset to the judgment against Williams.

¶ 49                              3. Williams v. Kedar

¶ 50    Judgment was entered in favor of Kedar on Williams' defamation claim because Kedar's statements were accurate and substantially true. Judgment was also entered in favor of Kedar on Williams' breach of contract claim as Williams failed to prove the necessary elements of a contract.

¶ 51    With respect to count X, breach of duty, the court found that Kedar, as Dafna's manager, owed a fiduciary duty to Dafna and Williams. Kedar breached that duty by intentionally collecting cash rents for the Washington Avenue property and depositing them into his personal bank account without reimbursing Dafna or Williams for their portion of the rents. The court also found that Kedar intentionally failed to provide the proper reports as required by Dafna's operating agreement, and that both Dafna and Williams suffered injury as Williams was unaware of the funds actually due to her. Additionally, Kedar used a Dafna credit card to pay for his personal expenses, he used Dafna's money to acquire Shub's 10% ownership of Dafna, and intentionally made efforts to conceal his personal use of Dafna's funds. With respect to the Baltimore and Laredo properties, the court found that Kedar personally took control over all of the rental income and never made any distributions to Williams, nor did he provide documentation for his use of the funds, both of which were breaches of his fiduciary duty to Dafna and Williams. The court further concluded that Kedar breached his fiduciary duty by intentionally withholding and failing to distribute the proceeds from the sale of the Laredo property.

¶ 52    The court granted Williams' request for punitive damages assessed against Kedar because it found that Kedar failed to properly manage Dafna since its inception and intentionally failed to provide any accounting or financial reports, instead using "Dafna's funds as his personal piggy bank." The court found punitive damages appropriate because Kedar breached his fiduciary duty

to Dafna on many occasions, that his conduct was willful and with an evil motive, and further on the belief that Kedar would commit similar wrongs in the future or that the imposition of punitive damages would act as a deterrent to such future conduct.

¶ 53    Williams was awarded damages in the amount of $52,000 for her share of the Washington Avenue rents, $122,533.42 for her portion of the Laredo and Baltimore rents, as well as 20% of the proceeds of the Laredo property sale, or $180,000, for a total compensatory damage award of $355,033.42. The court also awarded Williams $250,000 in punitive damages and noted that Williams continued to own 20% of Dafna.

¶ 54                           F. Posttrial Proceedings

¶ 55    On May 28, 2020, Dafna, Techno and Kedar filed motions to reconsider the circuit court's rulings; Techno and Kedar filed a joint motion. Dafna's motion to reconsider sought reconsideration of the portion of the court's order which allowed Williams an offset of funds held by the Clerk of the Circuit Court of Cook County against the judgment and prejudgment interest entered against her. Techno and Kedar's joint motion sought the following: (1) modification of the court's order on counts I and II of Techno's first amended complaint and counts I and II of Kedar's third-party counterclaim against Williams; (2) modification of the calculation of Techno/Kedar's contribution towards the purchase and rehabilitation of the properties for an additional award of $77,128.65; (3) an order for Williams to transfer $77,128.65 to Techno/Kedar for the 2019 second installment and first 120 days of 2020 in property taxes for the properties; (4) an order for Williams to reimburse Techno/Kedar for costs and fees associated with transfer costs for the properties; (5) an order for Williams to reimburse Techno/Kedar $6000 for title insurance for the properties; (6) an order for Williams to provide Techno/Kedar with the bookkeeping records for the properties;

(7) an order for Williams to transfer $308,854 (83.55%) of the legal fees taken from LWF) to Techno/Kedar; and (8) an order for Williams to return all of Techno's data.

¶ 56    Dafna's motion to reconsider was partially granted and partially denied on September 24, 2020. Dafna did not file a notice of appeal. After a hearing on September 21, 2020, the circuit court denied Techno and Kedar's joint motion to reconsider in a written order on September 28, 2020. Techno and Kedar subsequently filed their timely notice of appeal on October 19, 2020. Thus, this court has jurisdiction to consider the appeal pursuant to Supreme Court Rules 301 and 303(a)(1).

¶ 57                                      ANALYSIS

¶ 58                                   A. Introduction

¶ 59    On appeal, plaintiff and counterdefendant Techno and third-party defendant, third-party counterplaintiff Moshe Kedar (Kedar) contend that: (1) the circuit court incorrectly entered judgment on issues not plead by any party on Williams' third-party complaint; (2) the circuit court did not correctly assess damages in a derivative action (third-party complaint); (3) the circuit court did not correctly assess punitive damages against Kedar (third-party complaint and counterclaim); (4) the circuit court did not properly determine compensatory damages (complaint and third-party countercomplaint); (5) the circuit court improperly allowed Williams to use contested funds to pay her attorney fees; and (6) the circuit court incorrectly refused to order William to pay taxes and transfer costs for properties transferred as a result of the litigation.

¶ 60                                   B. Forfeiture

¶ 61    We first note that three of the issues raised by appellants on appeal were not included in their posttrial motion for new trial and were also not included in the notice of appeal. Specifically,

appellants did not raise any issue concerning its claims that: (1) the circuit court improperly entered judgment on issues not plead by any party; (2) the circuit court did not correctly assess damages in a derivative action; and (3) the circuit court did not correctly assess punitive damages against Kedar.

¶ 62    In order to properly preserve an issue for an appeal, a party must both make a contemporaneous objection and raise the issue in a posttrial motion. *Jackson v. Seib*, 372 Ill. App. 3d 1061, 1076 (2007); Ill. S. Ct. R. 366(b)(2)(iii) (eff. Feb. 1, 1994) . However, in civil bench trials, "[n]either the filing of nor failure to file a post judgment motion limits the scope of review." Ill. S. Ct. R. 366(b)(3)(ii) (eff. Feb. 1, 1994). Moreover, it has been repeatedly held that the failure to raise an issue in a posttrial motion does not preclude a party from raising that issue on appeal in nonjury civil trials. *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 12. Therefore, appellants' failure to include arguments (1), (2) or (3) in their motion to reconsider is not fatal to their arguments on appeal. *Id.* We now turn our attention to the merits of appellants' appeal.

¶ 63                            C. Standard of Review

¶ 64    The standard of review that a reviewing court applies to a circuit court's decision following a bench trial is to determine if the judgment is based on facts that are against the manifest weight of the evidence. *Wade v. Stewart Title Guaranty Company*, 2017 IL App (1st) 161765, ¶ 59. A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id.* The manifest weight of the evidence standard gives great deference to the trial court because it is in a superior position to determine the credibility of the witnesses, observe witnesses' demeanor and resolve conflicts in their testimony. *Id.* We will not disturb a trial court's judgment

as long as there is evidence to support the judgment. *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 25.

¶ 65    In reviewing the trial court's conclusions of law, we apply a *de novo* standard of review. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). Under the *de novo* standard of review, the reviewing court does not need to defer to the trial court's judgment or reasoning. *Wade*, 2017 IL App (1st) 161765, ¶ 60. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Id.* We may affirm the judgment of the trial court on any basis in the record, regardless of whether the trial court relied on that basis or whether the trial court's reasoning was correct. *Northwestern Memorial Hospital*, 2014 IL App (1st) 133008, ¶ 25.

¶ 66              D. Rulings on Williams' Second Amended Third-Party Counterclaim

¶ 67    Techno and Kedar's first three issues are related to the circuit court's rulings on Williams' Second Amended Third-Party Counterclaim against Kedar.

¶ 68              1. Judgment Not Conforming to Williams' Complaint

¶ 69    Techno and Kedar first contend that the circuit court improperly entered judgment on issues not pled by any party, namely finding that Kedar breached his fiduciary duty to Williams with respect to the Baltimore and Laredo properties. They argued that there was no mention of those properties in Williams' second amended third-party complaint against Kedar, thus the judgment did not match the pleadings.

¶ 70    Williams contends in her brief that while her complaint specifically alleged that Kedar breached his fiduciary duty by personally retaining rents collected from the Washington Avenue property, she did not limit her claim to that property. Instead, Williams claims that she pled damages related to Kedar's diversion of funds from the company and other unlawful actions and

requested judgment in her favor for any and all money Kedar wrongfully received from Dafna. She further maintains that because she pled that Dafna's sole purpose was to own the Washington Avenue property, any action Kedar took on behalf of Dafna by investing in other properties was prohibited by Dafna's operating agreement.

¶ 71　To prevail on a breach of fiduciary claim, it must be alleged and ultimately proved (1) that a fiduciary duty exists, (2) that the fiduciary duty was breached, and (3) that such breach proximately caused the injury of which the party complains. *Indeck Energy Services, Inc. v. DePodesta*, 2021 IL 125733, ¶ 47.

¶ 72　The breach of fiduciary duty count at issue is found in count X of Williams' derivative third party counterclaim as a shareholder of Dafna against Kedar. In count X, the complaint alleged that "Kedar breached his fiduciary duties to Dafna in each of the following ways:

> A. By renting out units of *** [73 Washington Avenue, Brooklyn, New York] for residential use;
>
> B. By depositing or having deposited all rents collected from the residential tenants into his personal bank accounts; and
>
> C. By failing to reimburse Dafna for the rents collected from tenants of *** [73 Washington Avenue, Brooklyn, New York]."

Williams further alleged that Kedar's breach of his fiduciary duties proximately caused harm to Dafna in the form of direct damages from Kedar's diversion of funds from the company and other unlawful actions; and further, on information and belief, alleged that Kedar collected and retained more than $250,000 in rents that belonged to Dafna.

¶ 73    As indicated above, the circuit court noted that during the course of litigation, Kedar sold the Washington Avenue property and completed a 1031 exchange with the sales proceeds by purchasing the Laredo and Baltimore properties. The circuit court's memorandum order also indicates that the parties executed a MOU related to the sale of the Washington Avenue property, in which Williams agreed: to execute Dafna's operating agreement, to the sale of the Washington Avenue property, and also to the purchase of the replacement properties to complete the 1031 exchange. The MOU, although completed in 2015 during the course of the litigation, was back-dated and made effective prior to the sale of the Washington Avenue property. It should also be noted that the operating agreement explicitly gave Kedar authority to make all decisions concerning the refinance or sale of the Washington Avenue property. With respect to Kedar's retention of collected rents, the circuit court found that Dafna received monthly rents from both the Laredo and Baltimore properties since their purchase. The court also found that Kedar personally took control over all of the rental income for both the Baltimore and Laredo properties and never made any distributions to Williams, nor did he provide any documents regarding his use of the funds, which was a breach of his fiduciary duty. The court then went on to compute Williams' share of the rental income for both the Baltimore and Laredo properties, as well as from the sale of the Laredo property.

¶ 74    The complaint frames the issues for the court and circumscribes the relief it can award. *Lo v. Provena Covenant Medical Center*, 356 Ill. App. 3d 538, 542 (2005). A plaintiff fixes the issues in controversy and the theories upon which recovery is sought by the allegations in her complaint. *Catom Trucking, Inc. v. City of Chicago*, 2011 IL App (1st) 101146, ¶ 25. It is a fundamental rule, with no exceptions, that a party must recover on and according to the case she has made for herself

by her pleadings. *Id.* Proof without pleadings is as defective as pleadings without proof. *American Standard Insurance Co. v. Basbagill*, 333 Ill. App. 3d 11, 15 (2002). Whether a matter is within the scope of the pleadings is a matter committed to the sound discretion of the trial court. *Timothy Whelan Law Associates, Ltd. v. Kruppe*, 409 Ill. App. 3d 359, 371 (2011).

¶ 75    Here, Williams' second amended third-party counterclaim, filed on March 16, 2011, made no mention of the Baltimore or Laredo properties, but challenged only the rents collected from the Washington Avenue property. The record indicates that the Washington Avenue property was sold in 2014 and the Baltimore and Laredo properties were purchased later that year. Further, as noted above, Williams executed a MOU in 2015 related to the sale of the Washington Avenue property as well as the purchase of the Baltimore and Laredo properties. Although Williams' prayer for relief includes general language requesting that the court "disgourg[es] Kedar of any and all money wrongfully taken or received from Dafna," this prayer must be read in the context of the complaint: as referring only to the monies Kedar retained from rents collected at the Washington Avenue property and not any monies concerning the Baltimore or Laredo properties, neither of which the complaint mentions. See *Lo*, 356 Ill. App. 3d at 542. A general prayer for relief is sufficient to warrant any judgment that is supported by the facts alleged in the complaint if those facts are proved by evidence. *Fritzsche v. LaPlante*, 399 Ill. App. 3d 507, 522 (2010). Additionally, courts are to construe pleadings liberally, with the view to do substantial justice between the parties. *A.J. Maggio Co. v. Willis*, 316 Ill. App. 3d 1043, 1050 (2000). While we agree that Williams properly pled and proved a claim for breach of fiduciary duty based on Kedar's mismanagement of Dafna related to the Washington Avenue property, Williams' allegations for breach of fiduciary duty completely fail to allege facts regarding the Baltimore and Laredo properties. Although the circuit

court has discretion to determine if a matter is within the scope of the pleadings (*Whelan Law Associates*, 409 Ill. App. 3d at 371), a circuit court lacks jurisdiction to adjudicate an issue not presented through proper pleadings. *IMC Global v. Continental Insurance Co.*, 378 Ill. App. 3d 797, 804-05 (2007). Here, Williams never pled any claims related to any fiduciary duty Kedar owed her with respect to the Baltimore and/or Laredo properties.

¶ 76    Moreover, section 2-616(c) of the Code of Civil Procedure (Code) (735 ILCS 5/2-616(c) (West 2018)) provides that "a pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs." Williams could have sought leave to amend her third-party counterclaim to conform to the proofs. Nevertheless, at no time, either during trial or after the circuit court entered its judgment, did Williams seek to do so, not even after executing the MOU in 2015 or her subsequent execution of Dafna's operating agreement. See *Kelly v. Orrico*, 2014 IL App (2d) 130002, ¶ 24; *In re J.B.*, 312 Ill. App. 3d 1140, 1145 (2000).

¶ 77    Nevertheless, this does not end our inquiry. We must determine whether the deficiency of the pleadings precluded Techno and Kedar from understanding the nature and circumstances of plaintiff's claim for damages and the theory behind that claim. See *Pickett v. First American Savings & Loan Association*, 90 Ill. App. 3d 245, 251 (1980). If so, and the claim was supported by evidence adduced at trial, the pleadings will be liberally construed. *Id.* In the interest of justice, courts of review will not ignore the plaintiff's real claim so long as it is supported by the evidence, even though it may not have been adequately pleaded. *Id.*

¶ 78    That is precisely the situation presented by this case. While Williams' pleadings failed to raise any claim related to the Baltimore and Laredo properties, the evidence presented at trial, and indeed the subject of some of the motions made during the course of the proceedings, indicates

that Techno and Kedar were well aware that Williams' real claim included allegations related to those properties. Pursuant to Supreme Court Rule 362 (eff. July 1, 2017), a reviewing court may on its own motion order an amendment to the pleadings. Therefore, pursuant to Rule 362 and in the interest of judicial economy, we hereby consider Williams' second amended third-party counterclaim amended on its face (*Jager v. Libretti*, 273 Ill. App. 3d 960, 968 (1995)), and affirm the circuit court's judgment in favor of Williams on count X of that pleading.

¶ 79                    2. Assessment of Damages in a Derivative Action

¶ 80    Next, Kedar and Techno challenge the circuit court's award of damages directly to Williams in her derivative actions as shareholders of Techno and Dafna. They contend that in a derivative action, the shareholder or member sues on behalf of the corporation or limited liability company, and the award is to the corporation or limited liability company, not the individual shareholder or member.

¶ 81    Williams does not contest that her action was a derivative suit but responds that the circuit court properly used its equitable powers to award her damages. Williams contends that under the terms of Dafna's operating agreement, Dafna's sole purpose was to operate the Washington Avenue property, and since the property was sold, it was operating outside of its purpose. Thus, Williams concludes, without citation to any authority, that Dafna could not do anything with funds received after July 2014 other than distribute them to its members.

¶ 82    Here, it is clear from a reading of Williams' second amended third-party counterclaim that she brought a derivative suit on behalf of Dafna, alleging a breach of fiduciary duties by Kedar for his retention of the Washington Avenue property rents without distributing them to Dafna. To determine whether a claim is derivative or direct, courts must focus on the nature of the alleged

injury. *Hamilton v. Conley*, 356 Ill. App. 3d 1048, 1054 (2005). If the injury is incurred by the corporation only, then the shareholder can bring a derivative claim only; they may not sue as individuals. *Id.* For over a quarter of a century, it has been settled law in Illinois that a claim that an officer or director has engaged in self-dealing is a claim of injury to the corporation and so must be brought derivatively. *Id.*

¶ 83    In a derivative action by a corporate shareholder, the suit is brought on behalf of the corporation for harm done to it where the corporation either cannot assert or refuses to assert its own right. *Caparos v. Morton*, 364 Ill. App. 3d 159, 167 (2006). As our supreme court has found, "derivative claims always and only belong to the corporation on whose behalf they are brought, and any damages awarded in a derivative suit flow exclusively and directly to the corporation, not to the nominal plaintiffs." *Stevens v. McGuireWoods LLP*, 2015 IL 118652, ¶ 15. The nominal plaintiff in a derivative suit serves only as a "champion" of the corporation's claims. *Id.*  The result is that the nominal plaintiff benefits only indirectly from a successful shareholder derivative suit, for example through an increased value on their shares. *Id.* Once the costs of bringing a derivative suit are paid, everything recovered belongs to and remits to the LLC, not to the nominal plaintiff. *Id*. See also 805 ILCS 180/40-15 (West 2018) (the Limited Liability Company Act (LLC Act) expressly states that once the nominal plaintiff's fees and expenses have been paid, the trial court "shall direct the plaintiff to remit to the limited liability company" the remainder of all judgment or settlement proceeds).

¶ 84    Given that Williams filed a derivative suit on Dafna, we find that she was unable to personally recover any damages from that action and that any damages were due to Dafna. Nor are we persuaded by Williams' unsupported contention that the circuit court could, in its discretion,

award damages to her individually as a result of the derivative suit if equity so required it. Our supreme court addressed this issue in *Stevens*, finding that the trial court would have had no discretion to ignore the statutory mandate concerning derivative actions and any resulting proceeds and that such position was contrary to both common law and statute. See *Stevens*, 2015 IL 118652, ¶¶ 19-20. Accordingly, we reverse the portion of the circuit court's judgment that awarded damages to Williams in her individual capacity in the derivative suit on behalf of Dafna as such damages should have been awarded to Dafna as a matter of law. As a result, the damages award should have been calculated based on compensatory damages to Dafna. Accordingly, the damages award must be reversed, and the cause remanded to the circuit court in order to recalculate compensatory damages due to Dafna. See *Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.*, 285 Ill. App. 3d 914, 919 (1996). We note that as of the date of the circuit court's ruling, Williams still had a 20% ownership of Dafna, thus any recalculation of damages should include amounts suitable to compensate Williams for distributions she should have received as a member of Dafna as related to the Washington Avenue, Baltimore, and Laredo properties.

¶ 85                      3. Assessment of Punitive Damages

¶ 86     Next, Kedar contends that the circuit court's decision to assess punitive damages against him and not Williams is arbitrary and unreasonable and should be reversed when the court found that Williams knowingly and willfully committed an abuse of her fiduciary relationship and engaged in intentional conversion. He argues that the punitive damages rulings and award were the result of judicial bias and partiality. Kedar contends that we review the punitive damages award under a constitutional due process standard as well as a common law standard.

¶ 87    The purpose of punitive damages is to act as retribution against the defendant, deter the defendant from committing similar wrongs in the future, and deter others from similar conduct. *Tully v. McLean*, 409 Ill. App. 3d 659, 669-70 (2011). Such damages will only be awarded where the defendant's conduct is willful or outrageous due to evil motive or a reckless indifference to the rights of others. *Id.* at 670. Punitive damages are not favored in Illinois, and available only in cases where the alleged wrongful act "'is characterized by wantonness, malice, oppression, willfulness, or other circumstances of aggravation.'" *Id.* (quoting *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 68 (2009)). The court must determine (1) whether punitive damages are available as a matter of law for the cause of action; (2) whether the facts show willfulness or other aggravating factors; (3) whether punitive damages should be awarded under the facts at bar; and (4) the amount of the punitive damages award. *Tully*, 409 Ill. App. 3d at 670.

¶ 88    On appeal from a bench trial, we first review *de novo* the circuit court's determination that punitive damages were available as a matter of law for Williams' cause of action. *Id.* It is well-settled that punitive damages are available as a matter of law for a breach of fiduciary duty (*ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277, ¶ 59), so there is no argument here.

¶ 89    We turn our attention to the factual determination of whether the facts show willfulness or other aggravating factors. We review the question of whether the defendant's conduct was of a character warranting punitive damages under the manifest-weight standard of review. *Tully*, 409 Ill. App. 3d at 670.

¶ 90    In the case at bar, Williams requested punitive damages from Kedar for his breach of fiduciary duty to Dafna. The circuit court specifically found that Kedar failed to properly manage Dafna since its inception: he collected cash from the residential tenants and deposited the rent into

his personal account for years; he intentionally failed to account for or distribute Williams' portion of the cash rent; failed to provide Williams with access to any of Dafna's books and records; intentionally failed to prepare any financial reports as required by Dafna's operating agreement; never provided Williams with any accounting or financial records but continued to use Dafna's funds as his "personal piggy bank;" sold the Washington Avenue property without Williams' knowledge; collected rents from the Baltimore and Laredo properties without providing any accounting or records; made no distributions to Williams for her portion of the collected cash rents; and intentionally did not distribute Williams' proceeds from the sale of the Laredo property. The circuit court concluded that it was appropriate to impose punitive damages against Kedar because as Dafna's manager, he intentionally breached his fiduciary duty to Dafna on many occasions. The court specifically found that Kedar's conduct was willful, and that he acted with an evil motive by his "oppressive management of Dafna and in willful disregard of Williams' rights as a Dafna member." The court concluded that such award would serve as retribution for Kedar's conduct and serve as a deterrent for similar behavior by others in the future.

¶ 91 Based on the record before us, we cannot say that the circuit court's factual determinations were in error as the record supports its findings of Kedar's intention and willful behavior, which support the award of punitive damages. See *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1148 (2004).

¶ 92 Our next inquiry is whether punitive damages should have been awarded under the facts of this case. The decision of whether to ultimately award punitive damages based on the finding of willfulness is a matter reserved to the trial court's discretion. *Id.* A trial court does not abuse its discretion unless no reasonable person could take its view. *Id.*

¶ 93    We find that the circuit court did not abuse its discretion in assessing punitive damages in this case. The circuit court correctly noted in its judgment that the purposes of a punitive damages award are retribution against the wrongdoer and deterrence of similar conduct by that party and others in general, and the court stated that its order against Kedar served those needs. The circuit court further stated that the $250,000 punitive damages award to Williams was "more than fair and reasonable under the circumstances." However, the circuit court incorrectly assessed punitive damages in favor of Williams in her individual capacity, as noted above, when her complaint was brought as a derivative suit. She was not entitled to receive any damages personally; all damages were due to Dafna. *Stevens*, 2015 IL 118652, ¶ 15. We therefore reverse the portion of the circuit court's judgment that awarded punitive damages to Williams; such damages should have been awarded to Dafna, and such award should be recalculated as necessary in assessing Kedar's behavior toward Dafna.

¶ 94                    E. Computation of Compensatory Damages

¶ 95    Next, Techno contends that the circuit court erred in entering an inadequate compensatory damages award to it, arguing that the circuit court's ruling regarding the percentage distribution of ownership of the properties was against the manifest weight of the evidence. Specifically, Techno argues that the $750,185 calculation of its contribution to the purchase of the properties ignores its transfer of $1,016,039 to LWF (less Williams' bonus of $192,000) and that those funds were used to purchase and renovate the properties. Techno contends that $824,039 of its money was used to purchase and renovate the properties. Techno also asserts that the circuit court ignored its additional costs of $147,408 associated with renovation of the properties after they were purchased; it argues that the court only considered the purchase price for the properties in

computing damages. Techno therefore contends that the $130,336 judgment against Williams should be increased by an additional $73,854, which is the difference between $750,185 and $824,039, plus the additional $147,408, for a total damages award of $351,598 to account for the renovation costs that it contributed to the properties.

¶ 96    This court will reverse a trial court's award of compensatory damages only if it is against the manifest weight of the evidence. *Bell Leasing Brokerage, LLC v. Roger Auto Service, Inc.*, 372 Ill. App. 3d 461, 473 (2007). The amount fixed as damages by the trier of fact will only be disturbed on review if it is obviously the result of passion and prejudice. *Goldstein v. Hertz Corp.*, 16 Ill. App. 3d 89, 98 (1973).

¶ 97    Here, the circuit court thoroughly explained its damage calculation and supported it with the record. The circuit court chose to use the purchase price for the properties as the basis for calculating damages. Additionally, when splitting the properties, the court considered the fair market value of the properties and allotted Techno and Williams properties based on their respective ownership split. The court found the estimated value of the 18 properties to be $2.25 million and awarded Techno/Kedar 80% of that value, or $1.8 million, and awarded Williams 20% of that value, or $450,000. Thus, Techno's claim that the circuit court only awarded it $130,336 is incorrect. The value of the compensatory damages awarded to Techno included properties valued at $1.8 million in addition to a $130,336 cash damages award. Since the circuit court heard the testimony of the parties and assessed their credibility, we should not disturb the court's damages award. We affirm the circuit court's award of damages to Techno.

¶ 98                        F. Issues Raised in Motion to Reconsider

¶ 99 Techno and Kedar's final issues on appeal were raised in their motion to reconsider. The purpose of a motion to reconsider is to alert the court of newly discovered evidence that was unavailable at the time of the hearing, or changes in the law, or errors in the court's application of the law. *Belluomini v. Zaryczny*, 2014 IL App (1st) 122664, ¶ 20. Generally, the trial court's ruling on a motion to reconsider is reviewed under the abuse of discretion standard, but when the motion to reconsider only asks the trial court to reevaluate its application of the law to the case as it existed at the time of judgment, the standard of review is *de novo*. *Id.*

¶ 100                    1. Use of Funds for Williams' Attorney Fees

¶ 101 Techno and Kedar contend that the circuit court erred by refusing to order Williams to reimburse Techno and Kedar for her use of LWF's funds to pay her attorney fees because she was sued in her individual capacity by Techno and Kedar for breach of fiduciary duty and individually by Dafna for breach of fiduciary duty and declaratory judgment. Techno and Kedar also argue that Williams brought claims against Techno and Kear in her individual capacity for breach of oral contract and defamation and derivatively on behalf of Dafna for breach of fiduciary duty against Kedar. They maintain that LWF was sued as a necessary party and did not assert any claims against any party nor did it have to defend any conduct separate and apart from Williams' misconduct, thus the use of LWF funds to pay her attorney fees was improper. Techno and Kedar further argue that because the funds used to pay Williams' attorney came from rental proceeds from the 18 properties, the circuit court erred by refusing to consider such. Techno and Kedar conclude that such action is inconsistent with the finding that Williams would not be awarded any fees in light of her conduct which included the conversion of the property.

¶ 102 We find that this argument is meritless as neither Techno or Kedar are members or managers of LWF and therefore have no standing to challenge any of LWF's operations, including the payment of Williams' attorney fees. See *Doherty v. Country Faire Conversion, LLC*, 2020 IL App (1st) 192385, ¶¶ 43-51. Section 15-10 of the LLC Act (805 ILCS 180/15-10 (West 2018)) protects the rights of members, and section 30-10 (805 ILCS 180/30-10 (West 2018)) provides that a nonmember has no right to participate in the management or conduct of the LLC's business. The record indicates that LWF was an Illinois LLC of which Williams was the sole member and manager. Accordingly, neither Techno nor Kedar had standing to challenge the payment of Williams' attorney fees by LWF, and the circuit court properly disregarded such challenge. We further note that this allegation was not contained in Techno's first amended complaint and was thus not properly before the court. As noted above, a plaintiff fixes the issues in controversy and the theories upon which recovery is sought by the allegations in her complaint. *Catom Trucking,* 2011 IL App (1st) 101146, ¶ 25.

¶ 103                     2. Taxes and Transfer Costs of Properties

¶ 104 Finally, Techno contends that the circuit court erred in not ordering Williams to pay the taxes and transfer costs for the 15 properties she was ordered to turn over to Techno/Kedar. In their motion to reconsider, Techno and Kedar asked the circuit court to modify the memorandum opinion and order to reflect that Williams convey legal title in a "commercially reasonable manner." Techno argues that Williams executed quitclaims to it for the 15 properties but property taxes for tax years 2019 and 2020 had not been paid, therefore, she should be ordered to pay the real estate taxes for 2019 and 2020.

¶ 105   An abuse of discretion standard of review applies when the denial of a motion to reconsider is based on new matters, such as additional facts or new arguments or legal theories that were not presented during the course of the proceedings. *Compton v. Country Mutual Insurance Co.*, 382 Ill. App. 3d 323, 330 (2008).  Here, as Techno's motion to reconsider requested a modification of the original order based on additional facts, our standard of review is abuse of discretion.

¶ 106   The record on appeal contains no report of proceedings or certified bystander's report for the hearing on Techno and Kedar's motion to reconsider. The written order entered by the circuit court denying their motion to reconsider indicates that on September 21, 2020, the court heard the arguments of counsels for the parties. It is the duty of every appellant in a reviewing court to provide a sufficient record to support a claim of error, and in the absence of such a record, the reviewing court will presume that the trial court's order was in conformity with established legal principles and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). In the absence of a proper record, a reviewing court may dismiss the appeal, or alternately summarily affirm the judgment of the trial court. *Marx Transport, Inc. v. Air Express International Corp.*, 379 Ill. App. 3d 849, 853 (2008). However, the failure to present a report of proceedings does not require automatic dismissal or affirmance where the issues can be resolved on the record as it stands. *Marx Transport*, 379 Ill. App. 3d at 853.

¶ 107   Our review of Techno's first amended complaint reveals that, in reference to the properties held by LWF, Techno's prayer for relief requested an order imposing a constructive trust on the properties in its favor, damages exceeding $50,000 plus exemplary damages and costs, as well as "such other and further relief as [the] [c]ourt deems just and appropriate." The record reveals that the circuit court granted Techno's request for a constructive trust of the properties and ordered

LWF and Williams to convey legal title of properties valued at 80% of the total to Techno as equitable relief. LWF, through Williams, conveyed legal title to Techno through quitclaim deeds in compliance with the circuit court's order. Techno's motion to reconsider asked the court to modify the order to include various costs of transfer of the properties as well as real estate taxes that were incurred but not yet due for the properties. However, without benefit of the report of proceedings from the hearing on Techno's motion, we are unable to determine the circuit court's reasoning in denying its request to include the tax costs and transfer costs in the equitable conveyance of title to the properties, and we must assume that the circuit court's decision had a proper factual basis. Moreover, as Techno has cited no caselaw in support of its proposition that it was entitled to such costs, we also presume that the circuit court's decision was in conformity with the law. We conclude that the denial of Techno's motion to modify the judgment was not an abuse of the circuit court's discretion.

¶ 108                                      CONCLUSION

¶ 109   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part. The matter is remanded for further proceedings consistent with this decision.

¶ 110   Affirmed in part; reversed in part; cause remanded.