2023 IL App (2d) 220093-U
No. 2-22-0093
Order filed March 8, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-477 |
| ROBERT CRAIG, | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice McLaren and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The defendant's trial counsel did not provide ineffective assistance.

¶ 2   In 2017, the defendant, Robert Craig, was convicted of multiple counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) and aggravated criminal sexual abuse (*id*. § 11-1.60(c)(1)(i)). He argues that his trial counsel provided him with ineffective assistance by failing to investigate and call two witnesses: his mother and his niece. After an evidentiary hearing at which he was represented by different appointed counsel, the trial court denied the motion. The defendant appeals. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4     The three victims in this case, T.C., A.G.C., and A.C., were the children of Richard C. and Teresa C. From 1998 to 2005, the family lived on Arrow Street in Carpentersville. The children's paternal grandmother, Kathryn C., lived across the street. Kathryn's adult granddaughter, Cassandra, and her young son lived with Kathryn from 2003 or 2004 to 2005. Kathryn had three sons: Richard (the children's father), Robert (the defendant here), and Ronald.

¶ 5     In the spring of 2005, Richard was arrested and charged with sexually assaulting his three children. He pled guilty and was sentenced to prison. The children were informally placed in the care of Cassandra at the time of Richard's arrest. They returned to Teresa's care after several months.

¶ 6     In 2015, A.C. told a high school counselor that the defendant had sexually abused her. An investigation followed and the defendant was charged with 16 counts of predatory criminal sexual assault and 9 counts of criminal sexual abuse of A.C., T.C., and A.G.C.

¶ 7                                   A. Trial

¶ 8     The defendant's jury trial took place in February 2017. As relevant here, the following evidence was introduced. Teresa C. testified that the defendant, her brother-in-law, was nicknamed "Lefty" because part of his right arm was missing. He often visited her home and Kathryn's home, staying overnight, and had many opportunities to be alone with her children. She learned of the abuse after her husband had been arrested for sexually abusing their children. She did not tell anyone because she did not know who to tell.

¶ 9     The children, who were adults by the time of trial, each testified about multiple assaults by the defendant both in their own home and in a "game room" in their grandmother's home. A.C. described the "game room" as "just the back bedroom that my grandma *** let us" sit, play games,

"or just play around in." (During her own testimony, Teresa C. likewise stated that Kathryn had a spare bedroom with a gaming system.) A.G.C. and A.C. testified that the incidents at their grandmother's home occurred before and also after Richard's arrest.

¶ 10   A Carpentersville police officer, Timothy Bosshart, testified that in 2005 he was assigned to investigate possible sexual abuse by Richard and the defendant. When Bosshart spoke with T.C., she told him of two incidents involving the defendant. In one incident, the defendant put her hand on his penis. This occurred on a night when family friends were staying over at her house and so she was sleeping on the living room sofa. Bosshart interviewed A.G.C. and A.C. on the same day; neither disclosed anything about the defendant. When Bosshart interviewed the defendant, the defendant denied abusing his nieces and nephew, although he admitted that once when he was drunk he fell into bed with his nieces. After the State rested, the trial court dismissed several counts as to which no evidence had been introduced.

¶ 11   The defendant's trial counsel, Ron Dolak, adopted the strategy of showing that the children were lying and confusing the abuse by their father with the alleged abuse by the defendant. To that end, Dolak hammered on the children's general failure to mention abuse by the defendant when they were interviewed in 2005, the discrepancies in their testimony, and their admittedly poor memories about much of what occurred during that time, which was 12 years earlier. Dolak also called Bosshart to confirm that in 2005 he had specifically asked both A.G.C. and A.C. if they had had any problems with the defendant and they both said no. Dolak called witnesses who confirmed that in 2005 the children never mentioned several of the details they had now testified to, and who effectively impeached Teresa C. regarding her awareness of Richard's abuse of the children. The defense also presented several family witnesses who testified to their positive

interactions with the defendant, and the defendant, who testified in his own defense and denied the charges.

¶ 12    The jury found the defendant guilty on all remaining counts: 11 counts of predatory criminal sexual assault and 6 counts of criminal sexual abuse.  He was sentenced to natural life in prison.

¶ 13                    B. Post-Trial Motions and Appeal

¶ 14    The defendant filed a motion and then an amended motion for a new trial, arguing among other things that newly discovered evidence required a new trial.  The new evidence was that, shortly after the trial, the defendant's sister-in-law, Cindy C. (Ronald's wife) told an investigator that T.C. told her in 2005 that the defendant had not touched her.  In an affidavit, Cindy said that, after Richard was charged, she asked T.C. if anyone else had ever touched her.  T.C. responded, "No, just Daddy."  The trial court denied the motion for a new trial, finding that Cindy's statement could have been discovered before trial and that her testimony was cumulative and not of such a conclusive nature as to change the outcome.

¶ 15    A presentence report was prepared, which the trial court reviewed prior to sentencing.  In it, the defendant complained that his attorney did not call as witnesses either Kathryn or Cassandra. He stated that Cassandra had cared for the children after Richard was arrested and the children had told her that the defendant did not abuse them.  After sentence was imposed, the defendant appealed, arguing that the trial court erred by failing to conduct an inquiry into the allegations of ineffective counsel raised in the presentence report, as required by *People v. Krankel*, 102 Ill. 2d 181 (1984).  We agreed and remanded the case to the trial court for the limited purpose of conducting a *Krankel* inquiry.  *People v. Craig*, 2020 IL App (2d) 170679, ¶ 21.

¶ 16                    C. Proceedings on Remand

¶ 17    On remand, the trial court determined that the defendant was entitled to be represented by new counsel to assist him in advancing his claim.  New counsel filed an amended motion for a new trial, asserting the ineffectiveness of trial counsel and attaching affidavits from Kathryn and Cassandra.

¶ 18    Kathryn's affidavit stated that her home did not have a game room and that, during the period after Richard's arrest when the children were living there, the defendant "never came to [her] house" and had no contact with the children.

¶ 19    In Cassandra's affidavit, she averred that, while she was living with Kathryn before Richard's arrest, the defendant often visited Carpentersville, staying sometimes at Kathryn's and sometimes across the street with Richard's family.  However, the children never spent the night at Kathryn's house when the defendant was there.  When the children came over, they were always with their mother and "never had the chance to be alone with" the defendant.  After Richard's arrest, she had temporary custody of the children for about a year, first living at Kathryn's and then at a house she bought in Loves Park.  The children did not have any contact with the defendant at either place, as he did not visit them and they did not visit him.  Her grandmother's house did not have a game room that she was aware of.  Cassandra also averred that she never discussed the abuse allegations with the children until "a couple of years ago" when she asked T.C. about the allegations.  T.C. said that her father sexually abused her but "never said anything about" the defendant abusing her.

¶ 20    In December 2021, the trial court held an evidentiary hearing on the motion for a new trial. Kathryn, Cassandra, the defendant, and Dolak testified.  Kathryn testified that the defendant visited often before Richard's arrest, staying at Richard's house or at hers.  However, he never spent the night at her house when the children were there.  She did not recall if the children were ever over

visiting at her house when he was there, as "[t]hey were in and out." She was working during this time and was not always home. The defendant had a key to her house, and she did not remember if he came to her house when she was not there. She had no knowledge of any time that the defendant was alone in her house with the children.

¶ 21    Kathryn said that the defendant had been staying with Richard when Richard was arrested. The defendant left Carpentersville that same day and did not return while the children were living in her house, which was for about four to six months after the arrest when they were in Cassandra's care. The only time after that when she had seen the defendant with the children at her house was at a family Christmas gathering a few years later.

¶ 22    Her house had three bedrooms. She slept in one and Cassandra and Tommy slept in another. The third bedroom was a spare room that had no bed in it until the children moved in after Richard's arrest. Her computer was in that room.

¶ 23    Cassandra testified that she and her son Tommy had been living with her grandmother Kathryn for at least a year or two before Richard was arrested. Kathryn's third bedroom was set up as a computer room at that point. The defendant would visit, often staying overnight at Richard's and sometimes with Kathryn. Before Richard's arrest, the children would come over to visit, but always with either their mother or their father. As far as she knew, they were never alone with the defendant.

¶ 24    Cassandra said that she had informal custody of the children for about nine months after Richard's arrest, and they all lived in Kathryn's house for a few months until she bought a house in Loves Park. The defendant never came to visit in either location and they did not visit him. She was working the third (overnight) shift at a hospital during this time. She would come home in the morning and take the children to school and then return home and go to sleep. Kathryn would

leave for work about 1:30 p.m. They kept to the same schedule in the summer, when the children were not in school.

¶ 25 About three or four years ago, T.C. came to Minnesota to stay with Cassandra for about three months. This was right before the defendant's trial, although Cassandra did not know that— T.C. "lied" to Cassandra about why she was leaving, but Cassandra later learned that T.C. left to go back to Illinois to testify at the trial. While T.C. was staying with her, Cassandra asked her about the defendant. T.C. said that she did not remembering "anything happening" with him but did say what her dad and mom "did to her." Asked specifically about the defendant, T.C. did not remember anything except that sometimes he would sleep in the same bed with them, but she did not remember him touching her or "doing anything to her." Cassandra did not speak to Dolak or any investigator about this before the defendant's trial.

¶ 26 The defendant then testified. Dolak was his lawyer for the trial. Dolak would visit him in jail every three or four months and communicate with him about trial strategy. Dolak asked him to write a list of witnesses he thought would be helpful, and he put Kathryn and Cassandra on the list. He told Dolak that Kathryn and Cassandra would contradict the children's testimony. Dolak never said that he spoke with them; instead, Dolak said that he was trying a different tactic. He knew that Dolak's strategy was to show that the children were lying and confused. As for his contact with the children, the only time he had seen them after Richard's arrest was Christmas 2014, when everyone was at Kathryn's. There were many people there and he was not alone with any of the children.

¶ 27 The final witness was Dolak. He described meeting with the defendant regularly, getting a list of potential witnesses from him, and discussing trial strategy with him. Before trial, he and the defendant went over the list of witnesses to be called at trial. The defendant wanted other

witnesses to be called. After Dolak discussed those other witnesses with the defendant, they did not call those witnesses.

¶ 28 Kathryn was not on the defendant's list of possible witnesses. Early in the case, they had discussed whether to call her and had decided not to. Apparently confusing Cassandra with Cindy C., Dolak testified that the defendant did not list Cassandra on his witness list and he did not know about her until after he had filed a motion for new trial, but once he learned about her, he filed an amended motion for new trial. Asked whether he was confusing Cassandra and Cindy, Dolak stated that he did not know of Cassandra—she was "new to [him]."

¶ 29 In closing, the defense argued that Dolak's failure to call Kathryn and Cassandra was unconstitutionally defective representation and was prejudicial because it would have contradicted the testimony of A.C. and A.G.C. that the defendant abused them at their grandmother's house even after Richard's arrest. Nor had the State produced the defendant's list of potential witnesses to show that Kathryn and Cassandra were not on it. The State argued that Dolak's performance was not deficient because he had not known of Cassandra until after trial and he had discussed calling Kathryn with the defendant and they agreed not to call her. Further, the failure to call these two witnesses was not prejudicial for several reasons. First, all of the witnesses agreed that there was in fact a room at Kathryn's house that the children played in. Second, despite Kathryn's and Cassandra's testimony, the defendant had had the opportunity to abuse the children after Richard's arrest, as he had a key to Kathryn's house and during trial he testified that he would visit her house when she was not there, and he could have done so while Cassandra was sleeping during the day.

¶ 30 About two months after the hearing on the posttrial motion, the trial court issued a written decision. It denied the motion, finding that Kathryn's proposed testimony was undercut by her admission that she was often at work and the defendant had keys to her home, where the children

were staying. Similarly, Cassandra had acknowledged that she slept during the day, including some of the time when Kathryn was working. And the witnesses agreed that the children played games in a spare bedroom that had no bed. As for the defendant's testimony that he told Dolak to contact Kathryn and Cassandra, it was contradicted by Dolak's testimony that the defendant did not tell him that Kathryn should be a witness, and that Dolak was never told about Cassandra until after trial. The trial court found that Dolak was not ineffective, as he pursued a reasonable trial strategy in light of the evidence and circumstances of the case. Further, the failure to call Kathryn and Cassandra was not prejudicial, because "the testimony of the Defendant and his witnesses" was "not credible or persuasive," as it was "general and unspecific and was easily shown to be unpersuasive through cross-examination." The trial court therefore denied the motion for a new trial.

¶ 31                                    II. ANALYSIS

¶ 32     On appeal, the defendant again argues that, through Dolak's failure to investigate and call Kathryn and Cassandra as witnesses at trial, the defendant received ineffective representation of counsel. The State responds that the defendant has not met the test for such a claim.

¶ 33     Under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant arguing ineffective assistance of counsel must show not only that his or her counsel's performance was deficient but also that the defendant suffered prejudice as a result. *People v. Houston*, 226 Ill. 2d 135, 143 (2007). Specifically, under the two-prong *Strickland* test, "a defendant must show that (1) his counsel's performance *** fell below an objective standard of reasonableness, and (2) *** but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *Id*. at 144. Because a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either is fatal to the claim. *Strickland*, 466 U.S. at 687.

¶ 34     There is a strong presumption that counsel's actions or inactions—such as the decision not to present certain arguments, or not to call certain witnesses—constitute sound strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). To prove otherwise, a party must show that counsel's decision was so irrational and unreasonable that no reasonably effective attorney, facing like circumstances, would pursue such a strategy. *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 35     Here, it is clear that, as to Cassandra's testimony about T.C.'s statements shortly before the defendant's trial, Dolak's failure to investigate or call Cassandra as a witness was not ineffective representation. Dolak testified that he did not know of Cassandra before trial and had never been given her name, and Cassandra herself testified that she did not tell anyone about her potential testimony until after the defendant had been convicted.[1] Although the defendant testified that he told Dolak about Cassandra and Kathryn before trial and put them on his list of potential witnesses, in evaluating the witnesses' testimony at the hearing, the trial court determined that Dolak's testimony to the contrary was more credible than the defendant's. The trial court "is in a superior position to observe the demeanor of the witnesses while testifying, to judge their credibility, and to determine the weight their testimony and the other trial evidence should receive" (*In re Estate*

---

[1] In his reply brief, the defendant notes for the first time that Cassandra was listed on the State's initial discovery disclosure, which it filed in 2015. It is well established that points not raised in the opening brief are forfeited (Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020)), and as the State had no opportunity to respond to this point, we find it forfeited. Moreover, given that T.C.'s statements occurred shortly before the defendant's trial began and Cassandra did not tell anyone about them, this evidence would not have been uncovered even if Dolak had interviewed her earlier in the case.

*of Bennoon*, 2014 IL App (1st) 122224, ¶ 72), and thus we "may not substitute our judgment for that of the trial court" on these issues (*Tully v. McLean*, 409 Ill. App. 3d 659, 670-71 (2011)).

¶ 36     Nor was the absence of Kathryn's testimony and the remainder of Cassandra's testimony so prejudicial to the defendant that it requires a new trial.  The test for whether counsel's actions or inactions prejudiced the defendant is whether "there is a reasonable probability that the result of the proceeding would have been different." *Houston*, 226 Ill. 2d at 144.  Here, neither Kathryn's nor Cassandra's testimony showed that, as they asserted, the defendant could not have abused A.C. and A.G.C. at Kathryn's house after Richard's arrest.  Kathryn and Cassandra admitted that they were regularly away from the home or asleep while the children were there, and the defendant himself testified that he had a key and sometimes visited Kathryn's house when she was not there. Further, Kathryn's and Cassandra's testimony that there was no "game room" at Kathryn's house was thoroughly rebutted and actually confirmed the children's testimony instead of contradicting it.  In light of the low probative value of this testimony, we cannot conclude that there is a reasonable probability that that the defendant would have been acquitted if the testimony had been presented to the jury.

¶ 37                                      III. CONCLUSION

¶ 38     For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 39     Affirmed.